Blake D. Miller (4090)
Deborah R. Chandler (12057)
**MILLER TOONE, P.C.**
165 Regent Street
Salt Lake City, Utah 84111
Telephone: (801) 363-5600
Facsimile: (801) 363-5601
E-mail: miller@millertoone.com
            chandler@millertoone.com

Attorneys for the Debtor

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**FINGER LICKIN' BRANDS, LLC dba Dickey's Barbecue Pit of Utah**<br><br>Debtor. | **Bankruptcy Case No. 15-24141**<br>**Chapter 11**<br><br>**Honorable Joel T. Marker**<br><br>**(Filed Electronically)** |

## MOTION FOR APPROVAL OF ASSUMPTION AND ASSIGNMENT OF GILLETTE REAL PROPERTY LEASE

Finger Lickin' Brands, LLC ("Debtor"), pursuant to 11 U.S.C. § 365, and Fed. R. Bankr. P. 6006, seeks authorization to assume and assign the lease entered into between the Debtor and Powder Basin Shopping Center, LLC, a copy of which is attached as Exhibit "A" (the "Lease") in connection with, and conditioned upon, the closing of the related sale by the Debtor of the restaurant operations performed on that location. In support of this Motion, the Debtor represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## BACKGROUND AND RELIEF REQUESTED

2.      The Debtor is a limited liability company that owns and operates seven "Dickey's Barbecue Pit" franchised restaurants in Utah and Wyoming.

3.      On May 5, 2015, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.      By separate motion [Docket No. 63], the Debtor has sought permission to sell two of its restaurant locations: the Dickey's Barbecue Pit restaurant located at 290 N. Central Avenue, Farmington, Utah (the "Farmington Restaurant") and the Dickey's Barbecue Pit restaurant located at 2610 Douglas Hwy, Gillette, Wyoming (the "Gillette Restaurant").

5.      The Gillette Restaurant is operated on real property subject to the Lease. Pursuant to the proposed sale of that restaurant, the prospective purchaser will assume the Lease. Following assumption of the Lease by the purchaser, the Debtor will have no further rights in, or responsibilities under, the Lease.

6.      Currently, there is due and payable under the Lease the sum of $21,500.00. The Debtor proposes that all sums currently due under the Lease will be paid at the closing of the proposed sale and be a condition to assumption and assignment of the Lease to the purchaser. Such cure will satisfy the provisions of 11 U.S.C. §365(b)(1)(A) and (B).

2

7.    The proposed purchaser and new lease of the Gillette Restaurant is Brandon Morgan ("Morgan").   The Debtor is informed and believes that the financial condition and ability of Morgan is better than the financial condition of the Debtor and its guarantors under the Lease. Information regarding the financial condition of Morgan has been, or is in process of being submitted, to the landlord.

8.    Assignment of the Lease to Morgan will provide adequate assurance of future performance as set forth in 11 U.S.C. §365(b)(1)(C).

9.    The Debtor seeks authority to assume and assign the Lease only in connection with, and conditioned upon, the closing of the proposed sale of the Gillette Restaurant as outlined in the Motion to Sell [Docket No. 63].

10.    Assumption and assignment of the Lease is a critical portion of the proposed sale. Thus, the Debtor requests that it be allowed to assume and assign the Lease upon entry of the order approving the same notwithstanding Bankruptcy Rule 6006(d).

WHEREFORE, the Debtor requests authority to assume and assign the Lease in connection with the proposed sale of the Gillette Restaurant, effective upon entry of the applicable order.

DATED: June 22, 2015

**MILLER TOONE, P.C.**

/s/ *Blake D. Miller*
Blake D. Miller
Deborah R. Chandler
*Attorneys for the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2015, I electronically filed the foregoing **MOTION**

**FOR APPROVAL OF ASSUMPTION AND ASSIGNMENT OF GILLETTE REAL**

**ROPERTY LEASE** with the United States Bankruptcy Court for the District of Utah by using

the CM/ECF system. I further certify that the parties of record in this case, as identified below,

are registered CM/ECF users and will be served through the CM/ECF system:

- Deborah Rae Chandler, chandler@millertoone.com
- Blake D. Miller miller@millertoone.com, millermobile@gmail.com, miller@ecf.inforuptcy.com, miller.blaked@gmail.com
- Tim Dance tdance@swlaw.com, docket_slc@swlaw.com, snielsen@swlaw.com
- Peter J. Kuhn tr Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov; Lindsey.Huston@usdoj.gov; Suzanne.Verhaal@usdoj.gov
- Timothy M. Lupinacci tlupinacci@bakerdonelson.com
- United States Trustee USTPRegion19.SK.ECF@usdoj.gov
- Isaac M. Gabriel isaac.gabriel@quarles.com
- Casey Jones cjones@strongandhanni.com
- Brooke Johnson brjohnson@strongandhanni.com
- Stephen Lewis slewis@utah.gov
- Michael Thomson thomson.michael@dorsey.com


/s/ *Blake D. Miller*
Blake D. Miller

4

# EXHIBIT "A"

# LEASE AGREEMENT

ARTICLE I  BASIC LEASE TERMS; PREMISES ................................................................... 2

ARTICLE II  TERM ................................................................................................................ 4

ARTICLE III  RENT AND OTHER TENANT CONTRIBUTIONS .................................... 5

ARTICLE IV  USE OF PREMISES ....................................................................................... 7

ARTICLE V        CONSTRUCTION, MAINTENANCE AND REPAIRS ......................... 9

ARTICLE VI  INSURANCE ................................................................................................. 12

ARTICLE VII  FIRE OR CASUALTY ............................................................................... 14

ARTICLE VIII  ASSIGNMENT AND SUBLETTING ....................................................... 15

ARTICLE IX  DEFAULT AND RE-ENTRY ...................................................................... 16

ARTICLE X  COMMON AREAS; RELOCATION ............................................................ 17

ARTICLE XI  EMINENT DOMAIN .................................................................................... 18

ARTICLE XII  GENERAL PROVISIONS .......................................................................... 18

ARTICLE XIII  RULES AND REGULATIONS ................................................................. 22

ARTICLE XIV  ADVERTISING .......................................................................................... 22

ARTICLE XV  FINANCIAL STATEMENT ....................................................................... 22

ARTICLE XVI  HAZARDOUS MATERIALS .................................................................... 23

ARTICLE XVII  OTHER PROVISIONS ............................................................................. 23

SIGNATURES ...................................................................................................................... 24

EXHIBIT A     Site Plan
EXHIBIT B     Description of Landlord's Work
EXHIBIT C-1   Receipt for Key Delivery and Acceptance of Occupancy of the Premises
EXHIBIT C-2   Designation of Authority to Accept Premises
EXHIBIT D     Shopping Center Sign Specifications
EXHIBIT E     Rules and Regulations

LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made as of November 19, 2013, by and between POWDER BASIN SHOPPING CENTER , LLC, a Delaware limited liability company, as tenants in common, (collectively, "Landlord"), and FINGER LICKIN' BRANDS, LLC, Series _____, a Utah series limited liability company ("Tenant").

## ARTICLE I
## BASIC LEASE TERMS; PREMISES

1.1 BASIC LEASE TERMS: The following terms are set out for reference only and are subject to the other terms and conditions of this Lease. This Section 1.1 does not contain a complete list of charges to Tenant.

(a)  Landlord Notice Address: 5670 Wilshire Boulevard, Suite 1250, Los Angeles, California 90036, with a copy to Arcadia Management Group, P.O. Box 10, Scottsdale, Arizona 85252-0010 (see § 12.7).

(b)  Tenant Notice Address: 461 West Century Drive, Murray, Utah 84123, or at Landlord's election after the Rent Commencement Date, at the address of the Premises (see § 12.7).

Tenant's Contact Person: John Thomson, Telephone: (801) 898-7600, E-Mail: jthomson99@msn.com.

(c)  Premises: The space located in Suite _____ in the shopping center known as "Powder Basin Shopping Center," in the City of Gillette, State of Wyoming, as depicted on Exhibit A attached to this Lease (see § 1.2).

(d)  Floor Area of Premises: Approximately 2,653 square feet (see §1.2).

(e)  Term Commencement Date: The date upon which Landlord delivers possession of the Premises to Tenant with the work required to be performed by Landlord pursuant to Exhibit B ("Landlord's Work") substantially completed.

Rent Commencement Date: The date that is the earlier of one hundred twenty  (120) days following the Term Commencement Date or the date that Tenant opens for business (see §2.1).

(f)  Minimum Rent (see §3.1):

(i)  Lease Year: $30.60 per square foot of Floor Area of the Premises per year ($6,765.15 per month). On each anniversary of the Rent Commencement Date, throughout the primary term of this Lease and any extension terms, the Minimum Rent rate per year shall increase to one hundred three percent (103%) of the Minimum Rent rate per year in effect for the immediately preceding lease year.

(g)  Percentage Rent: None.                                      (see §3.2)

(h)  Term: The period commencing on the Term Commencement Date and expiring on the day preceding the tenth (10th) anniversary of the Rent Commencement Date; provided, however, that if the Rent Commencement Date does not occur on the first day of a month, then the Term shall expire on the last day of the calendar month in which the tenth (10th) anniversary of the Rent Commencement Date occurs.

(i)  Extension Options: Two (2) options to extend the Term for a period of five (5) years Each (see §2.3).

(j)  First month's rent pre-paid: $6,765.15 (see §3.1).

(k)  Security Deposit: $6,765.15 (see §3.7).

(l)  Tenant's use: Tenant shall use the Premises as a fast casual and take-out Bar-B-Que restaurant and for the ancillary retail sale of merchandise bearing the logo of Tenant's business, and for no other purpose, except those outlined in Section 4.1, below. Except for the sale of Bar B Que food and the ancillary retail sale of merchandise bearing the logo of Tenant's business, in no event shall the Premises be operated for any use or purpose that violates the exclusive use restrictions in effect from time to time in favor of other occupants of the Shopping Center. For purposes of this paragraph (l), "ancillary retail sale" shall mean sales that do not generate more than ten percent (10%) of the

1

Tenant's total gross sales from the Premises.                    (see §4.1)

(m)    Tenant's trade name: Dickey's Barbeque Pit.

(n)    Broker: NAI Mountain West Retail.

(o)    Exclusive Use: See Section 4.6.

(p)    Radius/Non-Competition: See Section 4.7.

(q)    Estimated NNN Charges: Landlord's good faith estimate of the charges under Sections 3.4, 3.5 and 3.6 of this Lease for 2013 is $1.85 per square foot of Floor Area of the Premises. Such amount is an estimate only and Tenant shall be required to pay its share of the actual amount of such expenses.

**1.2 DESCRIPTION:** Landlord hereby leases to Tenant and Tenant hereby leases and accepts from Landlord, subject to the terms and conditions of this lease, the Premises (the **"Premises"**) depicted on the site plan attached hereto as Exhibit A and incorporated by this reference and thereby made a part hereof. It is understood and agreed that said site plan does not constitute a representation, covenant or warranty of any kind by Landlord, and is preliminary and may be modified at any time, in one or more respects, without Tenant's consent, at the option of the Landlord, but the actual size, dimensions, and relative location of the Premises shall not be altered. The Premises shall have the approximate Floor Area set forth in Section 1.1(d). The Premises comprise a portion of a development which Landlord intends to develop as a shopping center.

**1.3 EXCEPTION AND RESERVATION:** Landlord reserves and excepts from the Premises the roof and exterior walls of the building or buildings of which the Premises are a part, reserves the right to change the number and location of buildings, building dimensions, the number of floors in any of the buildings, store dimensions, common areas, the name of the Shopping Center, and the identity and type of other stores and tenancies, provided only that the size of the Premises, reasonable access to the Premises and the parking facilities to be provided shall not be materially impaired, and further reserves the right in, over and upon the Premises as may be reasonably necessary or advisable for the servicing of the Premises or of other portions of the Shopping Center.

**1.4    DEFINITIONS:** For purposes of this Lease, the following terms (whether or not capitalized) shall have the following meanings:

(a)    **"Shopping Center"** means the entire proposed development, including any and all proposed structures (whether reflected in Exhibit A or hereafter incorporated in the center during the term of this Lease or any extension thereof), parking facilities, common facilities, and the like to be built on the property shown on said Exhibit A, as the same may from time to time be reduced, or as the same may from time to time be increased by the addition of other land, together with structures and the like thereon which may from time to time be included by Landlord, at the option of Landlord, in the development.

(b)    **"Common Areas"** means all areas of the Shopping Center available for the nonexclusive use in common by Tenant, other tenants in the Shopping Center and their employees and business invitees including without limitation, parking areas, service roads, appurtenant loading facilities, sidewalks and other areas constructed or to be constructed, subject, however, to the terms of this Lease and reasonable rules and regulations prescribed from time to time by Landlord. Common Area shall not include those areas which, from time to time, are designated by Landlord as being outside the Common Area, or which are leased to or within the exclusive control of another owner, tenant (including Tenant) or other occupant of the Shopping Center.

(c)    **"Substantially Completed"** means the date Landlord notifies Tenant that the work to be performed by Landlord in the Premises pursuant to Exhibit B is complete to the point that Tenant can begin installing fixtures and stocking merchandise therein without substantial interference by Landlord's contractors

(d)    **"Floor Area",** with respect to the Premises or any other leasable areas, means Landlord's estimate of the total enclosed leasable square footage measured from the exterior faces of all exterior walls, service corridor and fire walls, and from the center line of the common demising walls separating the Premises from other spaces. No deduction shall be made for columns or interior construction or equipment.

(e)    **"Taxes"** means all real property and other ad valorem taxes and assessments (special or general, ordinary or extraordinary, foreseen or unforeseen) levied or assessed against the Shopping Center or the underlying realty, including but not limited to fees, surcharges, license fees, public charges, taxes or excises on rent, the square footage of the Premises or Landlord's interest in this Lease, levies for parking privileges or environmental protection, and any increased real property taxes arising from a

2

change in ownership of or new construction affecting the Shopping Center or any part thereof.

(f) **"Applicable Rate"** shall mean twelve percent (12%) per annum, or, if less, the maximum amount of interest that may lawfully be charged under the circumstances.

## ARTICLE II: TERM

**2.1 BASE TERM:** The original term of this Lease (the **"Term"**) shall commence on the Term Commencement Date set forth in Section 1.1(e) and shall continue for the period specified in Section 1.1(h) unless sooner terminated as hereinafter provided. Possession of the Premises will be verified by Tenant or Tenant's authorized designee as identified in Exhibit C-2 attached hereto taking possession of the keys thereto which will be verified in Exhibit C-1, Receipt for Key Delivery and Acceptance of Occupancy of the Premises. If Tenant fails to surrender the Premises upon the expiration of the Term, then the holdover provision set forth in Section 12.14 shall apply.

**2.2 PRIOR INSTALLATION:** Tenant, after delivery of the Premises to Tenant and prior to the Rent Commencement Date, shall be permitted to install leasehold improvements, fixtures and equipment in the Premises in accordance with Section 5 of this Lease.

**2.3 OPTIONS TO EXTEND:**

(a) **Exercise.** Provided (i) Tenant has not at any time been in default under any of the terms, covenants or conditions of this Lease through and including the commencement date of the extended terms hereinafter set forth, (ii) the Premises are being continuously operated for the use specifically permitted under Section 1.1(1) above, and in accordance with the other applicable provisions of this Lease, and (iii) Tenant is not in bankruptcy or receivership, and has not made an assignment for benefit of creditors pursuant to applicable state law, then Tenant shall have the option to extend the Term of this Lease for two (2) periods of five (5) years each (the **"Extension Terms"**). The second option shall not be exercisable unless Tenant exercises the first option. Tenant shall exercise the aforesaid options by providing Landlord with written notice which must be received by Landlord no later than one hundred eighty (180) days nor earlier than three hundred sixty five (365) days prior to the commencement of the applicable Extension Term. Tenant shall have no right to further extend or renew this Lease other than for the Extension Terms. Time is of the essence with respect to any exercise of such options by Tenant If Tenant fails to exercise an option when required, such option shall thereafter be of no force or effect.

(b) **Extended Term Rental.** If the options to extend described herein are exercised, then all of the covenants and agreements contained in this Lease shall apply during the applicable Extension Term, including, without limitation, that the Minimum Rent per year during each year of the applicable Extension Term shall increase to one hundred three percent (103%) of the Minimum Rent rate per year in effect for the immediately preceding lease year.

(c) **Option Personal.** The options set forth herein are strictly personal to only the entity executing this Lease as Tenant (**"Original Tenant"**), and may be exercised only so long as the Original Tenant occupies the Premises without otherwise assigning this Lease or subletting the Premises or any part thereof, and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than the Original Tenant. Said options are not assignable separate and apart from this Lease, nor may the same be separated from this Lease in any manner, either by reservation or otherwise.

## ARTICLE III
## RENT AND OTHER TENANT CONTRIBUTIONS

**3.1 MINIMUM RENT:**

From and after the Rent Commencement Date Tenant shall pay to Landlord, without offset or prior demand, the Minimum Rent set forth in Section 1.1(f), payable in twelve (12) equal installments in advance on the first day of each and every month during the Term at the office of Landlord at the location indicated in Section 1.1(a) or at such other place as may be designated in writing from time to time by Landlord. If the Rent Commencement Date occurs on a day other than the first day of a month, the first monthly installment of Minimum Rent shall be prorated on a thirty (30)-day basis and shall be paid on the date the Term commences. Concurrent with Tenant's execution of this Lease Tenant shall deliver to Landlord one full month's prepaid Minimum Rent and Estimated NNN Charges under Sections 3.4, 3.5 and 3.6 of this Lease, which prepayment shall be applied against the first month's Minimum Rent and Estimated NNN Charges.

**3.2 PERCENTAGE RENT:** Intentionally Deleted.

**3.3 LEASE YEAR:** For purposes of this Lease, "lease year" shall mean each twelve (12) month period of the Term commencing on and after the Rent Commencement Date, provided that if the

3

Rent Commencement Date commences on a day other than the first day of a calendar month, then the first lease year shall include the remainder of the partial calendar month during which the Rent Commencement Date occurs and the twelve (12) calendar month period thereafter and each subsequent lease year shall mean each respective twelve (12) calendar month period after the first lease year. If the first lease year is longer than twelve (12) calendar months, than the Minimum Rent and all other rent and charges payable under this Lease shall be prorated on a per diem basis for the first partial calendar month of the first lease year, based on a thirty (30) day month.

**3.4 TAXES:** Tenant agrees to pay to Landlord its proportionate share of all Taxes which may be levied or assessed by any lawful authority for each calendar year during the Term from and after the Rent Commencement Date including those assessed against the land and/or buildings comprising the Shopping Center. Tenant's proportionate share shall be the same ratio of the total amount due as the total Floor Area of the Premises (as set forth in Section 1.1(d)) shall bear to the total Floor Area of all tenant premises located on the property parcel(s) covered by such tax bill(s), including in all cases a pro rata share of the taxes attributable to the common areas of the Shopping Center. Tenant agrees to pay to Landlord on the first day of each month of the Term in advance such amount as Landlord shall estimate shall be equal to one twelfth $(1/12^{th})$ of the annual Tenant's share of the anticipated Taxes for the ensuing year, at the time and place provided for the payment of rent. Upon receipt of the tax bills for any given year, the Landlord shall compute the share of said bills due from Tenant and a summary shall be furnished to Tenant reflecting the actual amount of Taxes due. In the event the amounts paid by Tenant during the preceding period shall be in excess of its proportionate share, the excess shall be credited against the next ensuing tax payments due from Tenant; in the event the amount paid by Tenant shall be less than its proportionate share, then it shall pay the remaining balance within thirty (30) days after written notice is received by Tenant. The notice furnished Tenant shall also include a computation of the estimated sums that would be due from Tenant each month for the ensuing Lease Year and the monthly tax payment to be made as aforesaid shall be adjusted accordingly for the ensuing period. In the event Landlord shall elect to contest any proposed increase in Taxes, any expense incurred in such contest, including reasonable attorneys' fees or appraiser's fees shall be considered as tax expenses under the terms of this Section, and shall be borne by Tenant in the proportion above set forth. In the event the method of taxation applicable to rental property shall be adjusted or modified, a modification agreement with respect to this Section 3.4 shall be entered into to equitably apply the principle hereof to said revised tax system. Tenant shall pay, before delinquency, all property taxes on its fixtures, furnishings, equipment, merchandise and other personal property; if any such taxes are assessed as part of the real property, an equitable allocation of the same shall be made by Landlord in good faith, which allocation shall be binding on the parties.

**3.5 INSURANCE:** Tenant agrees to pay to Landlord its proportionate share of all premiums and costs relating to fire and extended or all-risk coverage insurance, public liability insurance, workers' compensation insurance and all other insurance determined by Landlord to be required in connection with the Shopping Center and/or Common Areas (or, at Landlord's election, the portion thereof owned by Landlord), including without limitation, boiler and machinery insurance, earthquake insurance and rental loss insurance. Tenant's proportionate share shall be determined and adjusted in the same manner as provided for in Section 3.6 below. Within one hundred twenty (120) days after the end of each calendar year, Landlord shall supply Tenant with a statement covering all costs and expenditures as enumerated in this Section and a determination of Tenant's proportionate share. In the event the amount paid by Tenant shall be less than its proportionate share the same shall be paid within thirty (30) days after notice of such determination, or in the alternative, any payment made by the Tenant in excess of its share of the sum, shall be credited to the next sums due from Tenant. Said statement shall also contain a determination by Landlord of the monthly sum to be paid by Tenant during the succeeding months of the calendar year, which determination shall be based in part on the statement of expense for the preceding year modified by any known increases in the cost of said services.

**3.6 COMMON AREA MAINTENANCE:** Tenant agrees to pay monthly in advance from and after the Rent Commencement Date its estimated share of the Common Area expenses of the Shopping Center, which estimated share shall be the ratio of (i) the Floor Area of the Premises (as described in Section 1.1(d)), to (ii) the total Floor Area of all of the buildings in the Shopping Center benefited and served by said Common Area as determined by Landlord; with the exception that, with respect to certain tenant specific expenses, Landlord shall have the right to exclude from the calculation (i.e., both exclude as a Common Area expense and exclude from the Floor Area set forth in clause (ii) above the Floor Area of the applicable owner, tenant or occupant) expenses that are paid directly by an owner, tenant or occupant or for which the subject service is provided at the cost of such owner, tenant or occupant. The Common Area expenses shall include, to the extent provided by Landlord and without limitation, expenses incurred or paid by Landlord in connection with the operating, managing, equipping, lighting, repairing, and maintaining the Common Areas, landscaping and gardening (including periodic replacement), parking lot line painting and resurfacing, painting of exterior walls of buildings (including the Premises), lighting, traffic control, sanitary control, removal of snow, trash, rubbish and garbage and other refuse, signs and markers, fire protection, security, cost of all rentals of machinery and equipment in such maintenance, the cost of personnel to implement such services, to direct parking and to police the Common Areas and ten  percent (10%) of the foregoing costs

(excluding utilities and capital costs) to cover the administrative costs relative to the operation of said Common Areas or, in the alternative, if Landlord elects at Landlord's sole discretion to engage an independent contractor to manage and/or operate the Shopping Center, the costs, expenses and fees charged to Landlord in connection therewith. Within one hundred twenty (120) days after the end of each calendar year, Landlord shall supply Tenant with a statement covering all costs and expenditures as enumerated in this Section and a determination of Tenant's proportionate share. In the event the amount paid by Tenant shall be less than its proportionate share the same shall be paid within thirty (30) days after notice of such determination, or in the alternative, any payment made by the Tenant in excess of its share of the sum, shall be credited to the next sums due from Tenant. Said statement shall also contain a determination by Landlord of the monthly sum to be paid by Tenant during the succeeding months of the calendar year, which determination shall be based in part on the statement of expense for the preceding year modified by any known increases in the cost of said services.

Tenant may elect, within one hundred eighty (180) days following the date of Tenant's receipt of Landlord's statement(s) provided for hereinabove, to review Landlord's books pertaining to Common Area costs and expenses for the Shopping Center as billed to Tenant. If Tenant does not make such election within such one hundred eighty (180) day period, then Tenant shall have no further right to review Landlord's books hereunder. If Tenant so elects to review Landlord's books, such review shall occur on a date mutually acceptable to Landlord and Tenant, but in no event sooner than thirty (30) days and no more than ninety (90) days after the date of Tenant's election. Tenant's review shall be conducted by a Certified Public Accountant or equivalent professional, who is retained strictly on a non-contingency basis, and Tenant shall have no right to conduct a review using any party who is being compensated in whole or in part on a contingency or "profit-sharing" basis. The review shall be conducted at the office designated by Landlord and shall be during usual business hours. Tenant's right to review shall be restricted to one (1) time per calendar year and shall be at the sole cost and expense of Tenant. In no event may Tenant audit Landlord's books for any calendar year more than one (1) time. In no event shall Tenant's right to review relieve Tenant of its obligation to pay all amounts due as provided in the Lease. Any information obtained by Tenant in such review shall be confidential and shall not be disclosed to third parties except as may be required by law.

Notwithstanding any contrary provision of this Section 3.6, commencing with the calendar year following the first full calendar year of the Term, and continuing during the remaining Term of the Lease, Tenant's share of Common Area expenses (excluding utilities, snow removal and non-recurring items) under this Section 3.6 for each calendar year shall not exceed 105% of Tenant's share of Common Area expenses (excluding utilities, snow removal and non-recurring items) for the immediately preceding calendar year. For purposes hereof, "non-recurring items" shall mean items (such as but not limited to parking lot re-surfacing) that are not expected to be incurred more often than every 24-36 months.

Common area expenses (excluding taxes, insurance, utilities, trash removal, nonrecurring items and snow removal) for any year shall not increase by more than 5% per year.

**3.7 SECURITY DEPOSIT:** Upon execution of this Lease Tenant shall deliver to Landlord the Security Deposit described in Section 1.1(k) (the **"Security Deposit"**). The Security Deposit shall be held by Landlord, without liability for interest, as security for the timely performance by Tenant of all the terms of this Lease which are to be observed and performed by Tenant. Landlord shall not be obligated to hold the Security Deposit as a separate fund and may commingle the Security Deposit with other funds. If any sum payable by Tenant to Landlord shall be unpaid or if Landlord makes payments on behalf of Tenant, or performs any of Tenant's obligations under this Lease, then Landlord shall have the right to apply the Security Deposit as may be necessary to compensate Landlord toward the payment of the sum payable by Tenant to Landlord for loss or damage sustained by Landlord due to such breach on the part of Tenant, and Tenant shall, upon written demand with thirty (30) days advance notice, restore the Security Deposit to the original sum delivered to Landlord. If Tenant complies with all of the terms of this Lease, the Security Deposit shall be returned in full to Tenant at the expiration or termination of this Lease. In the event of bankruptcy or other debtor/creditor proceedings against Tenant, the Security Deposit shall be deemed to be applied first to the payment of rent and other charges due Landlord for all periods prior to the filing of such proceedings. Landlord may deliver the Security Deposit to the purchaser of Landlord's interest in the Premises in the event that such interest be sold, and thereupon Landlord shall be discharged from any further liability with respect to the Security Deposit and this provision shall also apply to any subsequent transferees.

**3.8 ADDITIONAL COSTS AND EXPENSES:** With thirty (30) days advanced written notice, Tenant shall promptly pay to Landlord any additional costs or expenses incurred by or imposed upon Landlord resulting from the nature of or conduct of Tenant's business in the Shopping Center.

**3.9 PAYMENT OF CHARGES:** All rent and other charges to be paid by Tenant shall be paid in lawful currency of the United States as provided in this Lease without any offset, deduction, abatement or counterclaim, and the nonpayment of any items when due (or with the monthly payments if not otherwise provided for herein) shall constitute an item of default under the terms hereof. Any and all sums of money or charges required to be paid by Tenant under this Lease shall be deemed "rent" or

"additional rent", whether or not the same be so designated. For each sum not paid to Landlord on or before the due date hereunder, Tenant shall promptly pay to Landlord, in addition to interest as specified in Article 10, a late charge equal to five percent (5%) of the overdue amount. The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment. A charge of Twenty-Five and No/100 Dollars ($25.00) will be assessed for checks returned due to non-sufficient funds.

## ARTICLE IV
## USE OF PREMISES

**4.1 TENANT'S USE:** The Premises shall be used and occupied by Tenant solely for the purpose described in Section 1.1(1) and only under the trade name specified in Section 1.1(m), and for no other purpose and under no other trade name without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole and absolute discretion, it being agreed that Tenant's use of the Premises and the trade name utilized by Tenant at the Premises are material consideration for this Lease. Tenant shall faithfully observe and promptly comply with all directions, rules, requirements, regulations and laws of any governmental authority with respect to use, occupancy and possession (**"Legal Requirements"**), shall comply with any ground lease, reciprocal easement agreement or other recorded instrument affecting the Shopping Center (collectively, **"CC&R's"**), and shall not violate in any manner any of the exclusive use rights granted by Landlord to any other tenants or occupants in the Shopping Center from time to time, which exclusive use provisions shall be made available for Tenant's inspection at Tenant's request; provided, however, that the exclusive use provisions to which Tenant shall be subject shall not prevent Tenant from serving barbeque food in its restaurant.

Tenant shall not use, or permit the use of the Premises in any such manner which is obnoxious to or out of harmony with the operation of a first-class shopping center, that will tend to create a nuisance or tend to unnecessarily disturb other tenants or occupants of the Shopping Center by reason of excessive noise, vibration, odors emanating from the Premises, overburdening of the parking facilities or Common Areas, or otherwise, or tend to injure the reputation of the Shopping Center. Tenant shall not use the Premises, or permit or fail to prevent the Premises to be used, (i) for any purpose or in any manner which is a public or private nuisance, (ii) for the sale or display of pornography, nudity, graphic violence, drug paraphernalia, or any goods and/or services that, in the sole and absolute discretion of Landlord, are inconsistent with the image of a community or family-oriented shopping center, (iii) as a massage parlor, adult bookstore or second-hand store, (iv) to operate primarily as a liquidation or clearance center, or to fail to maintain inventory quality and quantity comparable to that of Tenant's other first-class (A-level) stores in mall locations, (v) to permit the operation of coin-operated or vending machines or pay telephones in the Premises, or (vi) to operate any video, pinball or other gaming machines, (vii) to keep live animals of any kind unless otherwise permitted by the Lease or (viii) in a manner which will invalidate any property damage or liability insurance maintained on the Premises, the building on which the Premises is located or the Shopping Center.

Tenant shall not cause or permit any waste to occur in the Premises and shall not overload the floor, or any mechanical, electrical, plumbing, communications or utility systems serving the Premises. Tenant shall keep the Premises, and every part thereof, in a clean and wholesome condition, free from any objectionable noises or sounds (due to intermittence, beat, frequency, shrillness or loudness), obnoxious odors or nuisances. If Tenant's permitted use of the Premises under this Lease includes the sale of and/or preparation of food, Tenant shall at all times maintain a health department rating of "A" (or such other highest health department or similar rating as is available).

The Premises shall not be used for the conduct or advertising of an auction sale, a bankruptcy sale, a "fire" sale, a "going out of business" sale, a "continuous" sale, or any sale similar to the foregoing. The Premises shall not be used for any non-retail purpose not expressly and specifically provided for in Section 1.1(1), nor for the operation of any business not typically found at comparable first-class shopping centers in the geographic area in which the Shopping Center is located. Tenant shall not place, display or sell merchandise or other things outside the building on the Premises or on the sidewalks or on other Common Areas. Tenant shall not install, use or authorize any amplifiers or similar devices, or install, use or authorize in, on or about the Premises any advertising medium that may be heard or seen outside the Premises, such as flashing lights, search lights, handbills, loudspeakers, phonograph or broadcasts. The restrictions set forth in this Section shall extend to all agents and employees of Tenant.

If Tenant violates any of the provisions of this Article, Landlord may (a) cancel this Lease by giving thirty (30) days written notice to Tenant (allowing for the Tenant to cure the breach within fifteen (15) days of written notice), or (b) without canceling the Lease enter upon the Premises and use such force as is reasonably necessary to stop such violation and/or (c) may pursue any other remedy available under this Lease, at law or equity.

Except as provided in Section 4.6 of this Lease, Landlord makes no representation or warranty

6

whatsoever regarding the trade names or character of other businesses which may be operated at the Shopping Center or the size or location of any leasable space other than the Premises.

**4.2 HOURS:** Tenant shall conduct its customary business activities throughout all business hours and days as reasonable for the type of business being operated by Tenant in the Shopping Center; provided that Tenant agrees to be open for business at least fifty (50) hours per week, and Tenant shall not be open for business prior to 7:00 a.m. or after 11:00 p.m. without Landlord's prior written consent. Tenant's obligation to operate under this Section 4.2 shall be subject to interruptions due to strikes, fires, casualty or other comparable cause, and shall also be subject to reasonable periods for repairing, cleaning and decorating the Premises.

**4.3 UTILITIES:** Tenant agrees to pay, before delinquency, at Tenant's sole cost and expense, all charges for electric current, gas, sewer, heat, water, telephone, cable television, and all other utilities and all taxes or charges on such utility services which are used on or attributable to the Premises. In no event shall Landlord be liable for any interruption or failure in the supply of any utilities to the Premises not intentionally caused by Landlord.

**4.4 SIGNS:** Prior to Tenant's opening for business, Tenant, at its expense, shall install signage bearing its trade name above the Premises storefront on both the south and east exterior facades of the Premises (subject to governmental approval), which signage shall be constructed and installed in conformance with the Sign Specifications attached hereto as <u>Exhibit D</u> and by this reference incorporated herein. Tenant's signage shall be subject to all governmental laws and restrictions and shall be subject to Landlord's reasonable approval.

Tenant shall not place on any exterior door, wall or window of the Premises any other sign or advertising matter without first obtaining Landlord's written consent. All of Tenant's signage shall comply with applicable ordinances or other governmental restrictions and the determination of such requirements and the prompt compliance therewith shall be the responsibility of the Tenant.

In addition to the storefront signage described above, Landlord shall permit Tenant to exhibit its trade name on a panel selected by Landlord on one Shopping Center pylon sign in which the premises is situated. Tenant shall be responsible for the cost of the fabrication, installation, maintenance, repair and replacement of Tenant's sign panel on such pylon sign, and for Tenant's pro rata share (based on the size of Tenant's sign panel as compared to all other tenant sign panels on the pylon sign) for the fabrication, installation, maintenance, repair and replacement of the pylon sign. Landlord shall have the right to reasonably approve Tenant's sign panel.

**4.5 CONTINUOUS OCCUPANCY:** Tenant shall commence its construction and fixturization activities immediately upon the Term Commencement Date and shall open the Premises for business on or before the Rent Commencement Date. Tenant shall not be deemed "open" unless Tenant's exterior storefront signage is installed and operating. Tenant shall operate all of the Premises continuously during the entire Term under the trade name required by Section 14.1, on such days and for such hours as shall be required under Section 4.2, and will not cease operations in the Premises without the express written consent of the Landlord (which consent may be granted or withheld by Landlord in its sole and absolute discretion), unless prevented from doing business therein by reason of applicable ordinances or other acts of governmental authorities, or by acts of God, or conditions beyond the control of Tenant.

**4.6 EXCLUSIVE USE:** Provided that (i) Tenant is in possession of the Premises and continuously operating in the Premises a pizza food restaurant open to the public and in compliance with Section 1.1(1) and the other provisions of this Lease, and (ii) Tenant is not in default of the Lease (after the receipt of notice and the expiration of any applicable cure period), then Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within that portion of the Shopping Center owned and controlled by Landlord or its affiliates, by a tenant, subtenant, assignee, licensee or concessionaire (collectively **"Occupant"**) for the operation of a fast casual or take out restaurant engaged primarily in the sale of, or specializing in the sale of barbeque food similar to that found on Tenant's menu (the **"Exclusive Use"**). Notwithstanding anything to the contrary contained herein, the foregoing restriction shall not be applicable to (a) any space occupied pursuant to a lease entered into prior to the date of this Lease as to which Landlord does not have the right to restrict the Occupant from operating for the Exclusive Use, including any assignment, sublease, extension, renewal or modification of any such lease (other than modification of the permitted use clause to conflict with the Exclusive Use) or to Buffalo Wild Wings. For purposes of this Section 4.6, "primarily" shall mean that more than twenty-five percent (25%) of the Occupant's gross sales from its space in the Shopping Center are derived from the sale of Barbeque food described above in the definition of Exclusive Use set forth above. If at any time Tenant ceases to remain open to the public for the use set forth in Section 1.1(1) of this Lease or defaults under the Lease and fails to cure such default after notice and the expiration of any applicable cure period, then the restrictions set forth in this Section 4.6 shall automatically terminate and thereafter be of no further force or effect.

Landlord and Tenant acknowledge that the Exclusive Use has been included herein at the sole

7

request of Tenant, and in the event the Exclusive Use shall be construed to be or shall be declared to be invalid or unenforceable by the decision of any court or any governmental agency having jurisdiction over such matters or by the enactment of any law, ordinance or regulation, or in the event the Exclusive Use shall be construed to be or shall be declared to be in violation of any law, rule or regulation, including but not limited to any anti-trust laws, rules or regulations, Tenant agrees to indemnify, defend and hold Landlord harmless from and against any claim, demand, damage, cost or liability, including reasonable attorney fees and court costs, arising from Landlord's grant of the Exclusive Use.

In the event of a violation of the foregoing covenant by Landlord, Tenant shall not be entitled to monetary damages. Tenant's sole remedy shall be to reduce the Minimum Rent by fifty percent (50%) if such violation by Landlord is not cured within thirty (30) days after written notice from Tenant, provided that if Landlord fails to cure its violation within six (6) months after written notice from Tenant, then Tenant shall also have the right to terminate the Lease by written notice to Landlord prior to the date that the violation ceases to continue to exist. Such termination shall be effective thirty (30) days after Landlord's receipt of Tenant's termination notice. Tenant's right to reduce the Minimum Rent as set forth above shall continue only until the violation ceases to continue to exist.

Notwithstanding anything to the contrary contained herein, in the event the Exclusive Use is violated by another Occupant of the Shopping Center because said Occupant is operating in its premises in default of its permitted use as set forth in such Occupant's lease or occupancy agreement, then so long as Landlord diligently attempts to enforce its rights against such tenant from violating Tenant's Exclusive Use, Landlord shall not be deemed to have violated this Section 4.6, and Tenant shall not have any remedies against Landlord.

**4.7 RADIUS/NON-COMPETITION:** During the five (5) year period after Tenant opens for business, Tenant shall not own, lease, operate, manage or otherwise engage in, or permit any Tenant Affiliate to own, lease, operate, manage or otherwise engage in, any business that is competitive (as defined in Section 4.6) with the business to be conducted by Tenant in the Premises under this Lease, within a two (2) mile radius of the Premises. For purposes of this Section 4.7, a **"Tenant Affiliate"** shall mean (a) any person or entity that directly or indirectly has an ownership interest in Tenant, or (b) any entity in which Tenant and/or any person or entity described in clause (a) above directly or indirectly has an ownership interest. This Section 4.7 shall not apply to the ownership, lease, operation or management by Tenant or a Tenant Affiliate of a business that is owned, leased, operated or managed by Tenant or such Tenant Affiliate as of the date of this Lease, provided that such business is not hereafter (i) expanded, (ii) relocated to a location closer to the Premises, or (iii) modified to include, or increase the volume of, competitive uses beyond those existing as of the date of this Lease.

# A R T I C L E   V
## CONSTRUCTION, MAINTENANCE AND REPAIRS

**5.1   INITIAL CONSTRUCTION:** Landlord shall be responsible for the delivery of the Premises in the condition described on Exhibit B attached to this Lease. By accepting possession of the Premises, Tenant shall be deemed to have accepted the Premises, and the work performed by Landlord pursuant to Exhibit B, and the Common Areas, in their "as is, where is" condition, and acknowledges that, prior to execution of this Lease, it has had the opportunity to fully inspect the Premises and Shopping Center. Except as expressly provided in this Lease or Exhibit B, Tenant has not relied upon any representations or statements of any kind or nature made with regard to the condition of the Premises or Shopping Center or any other matter or thing affecting or related to the Premises or the Shopping Center by Landlord or any representative or agent of Landlord. Notwithstanding the foregoing, that work specifically made the responsibility of Landlord under Exhibit B shall be in good working order and condition upon delivery of the Premises to Tenant. Landlord shall be responsible for the cost of the performance of the work set forth on Exhibit B.

Upon delivery of possession of the Premises to Tenant, Tenant shall be responsible, at Tenant's sole cost and expense  for performing all  work, construction, improvements, installations or remodeling necessary to render the Premises suitable for Tenant's use for the purposes specifically permitted under this Lease **("Tenant's Work")**. All of Tenant's Work shall be done pursuant to plans, specifications and material samples which must be approved in advance in writing by Landlord. Tenant's plans shall be prepared (and Tenant's Work completed) in accordance with all applicable laws, and all applicable provisions of this Lease.

In consideration of this Lease, and Tenant's construction and development of the Premises in accordance with the provisions of this Lease, Landlord shall pay Tenant an allowance (the **"Tenant Improvement Allowance"**) in the amount of $66.00  per square foot of Floor Area of the Premises. The Tenant Improvement Allowance shall be paid directly to Tenant's contractor with fifty percent (50%) upon fifty percent (50%) completion with commensurate lien releases and the remaining fifty percent (50%) within thirty (30) days following the occurrence of the Completion Date (as defined below). As used herein, the **"Completion Date"** shall mean that date upon which all of the following have occurred:

(i)    Tenant's Work in the Premises has been fully completed in accordance with Tenant's approved plans;

(ii)    Landlord has received a signed, notarized statement from Tenant's general contractor stating the name, address and telephone number of all subcontractors, laborers, materialmen, craftsmen, or other suppliers of labor or materials, furnishing labor or materials to Tenant or for Tenant's benefit in connection with Tenant's Work;

(iii)    Landlord has received unconditional lien releases in the form required under applicable law from Tenant's general contractor, and all subcontractors, laborers, materialmen, craftsmen or other suppliers of labor or material furnishing same to Tenant or for Tenant's benefit in connection with Tenant's Work; and Landlord is satisfied that the Premises is free and clear of any mechanic's liens or similar claims, and that all sums payable by Tenant in connection with Tenant's Work have been paid in full;

(iv)    Tenant's business in the Premises is open for business to the public;

(v)    Any damage caused as a result of Tenant's Work has been repaired to Landlord's satisfaction;

(vi)    All of Tenant's Work is correctly permitted and in compliance with the laws, rules or regulations of any governmental authority;

(vii)    Tenant has provided Landlord with copies of all building permits, indicating inspection and approval by the issuer of said permits, and the original "Certificate of Occupancy" or its equivalent; and

(viii)    Landlord has received one (1) set of reproducible "as built" drawings and CAD files of Tenant's Work.

Landlord shall be entitled to deduct any past due amounts then owed to Landlord by Tenant under this Lease from the Tenant Improvement Allowance amount prior to funding same to Tenant, and Landlord shall be under no obligation to fund such Tenant Improvement Allowance if, at the time of such funding, Tenant shall be in default of any of the terms, covenants or conditions of this Lease beyond any applicable notice and cure period.

The Tenant Improvement Allowance shall be used by Tenant solely for the purpose of making permanent leasehold improvements in or to the Premises, and shall not be used for furniture, fixtures and equipment, design or other fees, permits, or signs. If Tenant's documented costs of constructing such permanent leasehold improvements in or to the Premises is less than the amount of the Tenant Improvement Allowance payable hereunder, the Tenant Improvement Allowance shall be reduced to the documented costs of such permanent leasehold improvements,

**5.2 TENANT'S DUTY TO REPAIR:**

(a)    Except as provided for in Section 5.4 of this Lease as being required of the Landlord and except for the painting of exterior walls of buildings by Landlord as part of Common Area maintenance, Tenant shall keep and maintain at its sole cost and expense, in good order, condition and repair (including any such repair and restoration as is required for that purpose) the Premises and every part thereof and any and all appurtenances thereto wherever located, including, but without limitation, the exterior and interior portion of all doors, door checks, windows, plate glass, skylights, store front, all plumbing and sewage facilities within the Premises including free flow up to the main sewer line, fixtures, heating and air conditioning and electrical systems including all conduits, wiring, transformers, panels and fixtures (whether or not located in the Premises), sprinkler system, walls, floors and ceilings, meters applicable to Tenants Premises, and all installations made by Tenant under the terms of this Lease and any exhibits hereto, as herein provided. Any repairs required to be made in the Premises due to burglary of the Premises or other illegal entry into the Premises, or any act or omission of Tenant or Tenant's agents, employees, contractors or representatives, or any damage to the Premises caused by a strike involving the Tenant or its employees, shall be made by Tenant at its sole cost and expense. Any charges to install, connect, or furnish service to the Premises made by any utility company or municipality shall be paid by Tenant within the time limit specified by each utility company or municipality.

(b)    Notwithstanding any provisions in this Article contained to the contrary, Landlord reserves the right at any time and from time to time throughout the Term to let or make an agreement or contract for the maintenance of the heating and air conditioning apparatus in the Premises or in the building of which the Premises form a part. In such event, Tenant shall promptly pay to Landlord, on a monthly basis, or as required by Landlord, Tenant's share of the cost of such maintenance contract, which share shall be apportioned according to the Floor Area of the Premises as it relates to the total Floor Area of the building or buildings which are included within the said maintenance contract or agreement.

(c)   Tenant shall keep and maintain the Premises in a clean, sanitary and safe condition and in accordance with all Legal Requirements, at the sole cost and expense of Tenant, and Tenant shall comply with all Legal Requirements affecting the Premises and all appurtenances thereto at its sole cost and expense. If Tenant refuses or neglects to commence and to complete repairs promptly and adequately, Landlord may, but shall not be required to, make and complete said repairs and Tenant shall pay the cost thereof plus a fifteen percent (15%) administrative fee to Landlord as Additional Rent upon demand.

**5.3 SURRENDER OF PREMISES:** Upon termination of this Lease or expiration of the Term, Tenant agrees to deliver to Landlord the Premises in the same condition as received by it (subject to the removals hereinafter required), broom clean, reasonable wear and tear excepted, and shall surrender all keys for the Premises to Landlord at the place then fixed for the payment of rent and shall inform Landlord of all combination of locks, safes and vaults, if any, for the Premises. Tenant, during the last thirty (30) days of such Term, shall remove all its trade fixtures and other personal property, so that they are removed by the last day of the Term, and, to the extent required by Landlord by written notice, any other installations, alterations or improvements provided herein, before surrendering the Premises aforesaid and shall repair any damage to the Premises caused thereby. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the Term. Any items remaining on the Premises on the termination date of this Lease shall be deemed abandoned for all purposes and shall become the property of Landlord and the latter may dispose of the same without liability of any type or nature and without compensation to Tenant, or Landlord may elect to store any or all of the same on Tenant's behalf at Tenant's expense.

**5.4 LANDLORD'S DUTY TO REPAIR:** Landlord shall keep and maintain the foundation, structural floor, exterior walls and roof of the building in which the Premises are located, the structural portions of the Premises (exclusive of doors, door frames, door checks, windows, and exclusive of window frames located in exterior building walls), and the utility pipes and conduits located outside the Premises, in good repair, except that Landlord shall not be called upon to make any such repairs occasioned by the act or neglect of Tenant, its agents, employees, invitees, licensees or contractors, resulting from improvements, work , alterations, construction or remodeling performed by or for Tenant. Landlord shall not be called upon to make any other improvements or repairs of any kind upon the Premises and appurtenances by reason of the negligence of Tenant, its agents, etc., as above described, or resulting from improvements, work, alterations, construction or remodeling performed by or for Tenant, and such work shall be the responsibility of Tenant notwithstanding the provisions above contained in this Section. Tenant hereby waives any and all rights under applicable law to make repairs at Landlord's expense. Tenant shall be obligated to reimburse Landlord for Tenant's pro rata share of the costs and expenses incurred by Landlord to perform Landlord's obligations under this Section 5.4, which reimbursement shall be in accordance with the same terms and procedures as those set forth in Section 3.6 of this Lease.-

**5.5 TENANT'S ALTERATIONS:** Tenant shall not alter the Premises (except for repairs as aforesaid), and shall not install any fixtures or equipment to be used in connection with Tenant's business which affect the Premises in any manner without first obtaining the written approval of Landlord to such fixtures and equipment, and the Landlord's approval of the manner in which said fixtures and equipment are to be installed and located in the Premises. Any request for consent shall be accompanied by a complete set of plans and specifications for the proposed alteration. Tenant shall pay all fees and costs incurred by Landlord in the evaluation of such plans and specifications.

**5.6 MECHANIC'S LIENS:**

(a)   If Tenant makes any alterations, additions, replacements or substantial repairs in or about the Premises, Tenant must pay for same when made. Nothing in this Lease shall be construed to authorize Tenant or any person dealing with or under Tenant, to charge the rents of the Premises, or the property of which the Premises form a part, or the interest of Landlord in the estate of the Premises, or any person under and through whom Landlord has acquired its interest in the state of the Premises, with a mechanic's lien or encumbrance of any kind, and under no circumstances shall Tenant be construed to be the agent, employee or representative of Landlord in the making of such alterations, additions, replacements or substantial repairs, but, on the contrary, the right or power to charge any lien, claim or encumbrance of any kind against Landlord's rents or the Premises or said land is denied. So long as the laws of this state shall provide for the filing of a statutory bond to eliminate the attachment of mechanic's or materialmen's liens to real estate, Tenant shall require that its contractor or itself shall take such steps as are provided by law for the filing of said statutory bond prior to the initiation of any construction. If a mechanic's or materialmen's lien is threatened by any contractor or supplier, or in the event of the filing of a notice of any such lien, Tenant will promptly pay same and take steps immediately to have same removed. If the same is not removed within ten (10) days from the date of written notice from Landlord, Landlord shall have the right at Landlord's option of paying the same or any portion thereof and the amounts so paid, including attorneys' fees and expenses connected therewith and interest at the Applicable Rate on any sums paid or advanced shall be deemed to be Additional Rent due from Tenant to Landlord and shall be paid to Landlord immediately upon rendition to Tenant of a bill therefore. Said right of Landlord to so satisfy any said lien to charge shall be in addition to any other rights reserved to

Landlord under the terms of this Lease or under applicable law and said right is not intended to be exclusive of any other remedies or means of redress to which Landlord may be lawfully entitled by reason of any breach or threatened breach by Tenant. Tenant will indemnify and save harmless Landlord from and against all loss, claims, damages, costs or expenses suffered by Landlord by reason of any repairs, installations or improvements made by Tenant.

(b)    At least fifteen (15) days prior to the commencement of any work or construction of any alterations, additions, replacements or substantial repairs in or about the Premises, Tenant shall notify Landlord in writing of the intended work and expected date of commencement thereof, and shall for and on behalf of Landlord, prepare and post such notices of non-responsibility and other similar notices as are permitted by law, or substantial repairs in or about the Premises. Landlord shall have the right at any time and from time to time to post and maintain on the Premises such notices as Landlord deems necessary to protect the Premises and Landlord from mechanic's liens, materialmen's liens or any other liens.

**5.7 ALTERATIONS REQUIRED BY LAW:** In the event that any Legal Requirements from time to time shall require alterations or installations of any kind to the Premises, including, but not limited to, handicap access, fire sprinklers, or emergency lighting, the installation, operation and maintenance of the same, including related utilities, shall be the responsibility of Tenant.

**5.8 ROOF:** Tenant will not cause or permit accumulation of any debris or extraneous matter on the roof of the Premises, will not in any manner penetrate, cut or drive nails into or otherwise mutilate the roof of the Premises and will be responsible for any damage caused to the roof by any acts of Tenants, its agents, servants, employees or contractors of any type or nature.

## ARTICLE VI
## INSURANCE

**6.1 LIABILITY OF TENANT:** Tenant will indemnify, defend, hold harmless and protect Landlord and the Shopping Center from and against any all claims, losses, costs, demands, penalties, charges, damages or expenses, including, but not limited to, reasonable attorneys' fees, arising out of or from any accident or other occurrence on or about the Premises causing injury to any person or property whomsoever or whatsoever, or for any violation of any laws or ordinances on the part of Tenant or those holding under Tenant,, or any breach or default under this Lease by Tenant, or any other harm or damage caused by the negligence or willful misconduct on the part of Tenant or those holding under Tenant, or any of their respective agents, employees, contractors, officers, guests, licensees or invitees.

**6.2 NOTICE OF CLAIM OR SUIT:** Tenant agrees to promptly notify Landlord of any claim, action, proceeding or suit instituted or threatened against the Landlord. In the event Landlord is made a party to any action for damages which Tenant has herewith indemnified Landlord against, then Tenant shall pay all costs and shall provide effective counsel in such litigation or shall pay, at Landlord's option, the attorney's fees and costs incurred in connection with said litigation by Landlord.

**6.3 LIABILITY INSURANCE:** Tenant agrees to maintain at its expense at all times during the Term full liability insurance properly protecting and indemnifying Landlord in the names of Tenant and Landlord against any and all claims for injuries to persons or damage to property occurring in, on or about the Premises in an amount not less than Two Million and No/100 Dollars ($2,000,000.00) per person and Two Million and No/100 Dollars ($2,000,000.00) per account for injuries or damages to persons, and not less than Two Million and No/100 Dollars ($2,000,000.00) for damage or destruction of property, written by Insurers licensed to do business in the state in which the Premises are located. Tenant shall deliver to Landlord certificates of such insurance, which shall declare that the respective insurer may not cancel the same in whole or in part without giving Landlord written notice of its intention so to do at least thirty (30) days in advance. Such policy shall contain contractual liability endorsement covering Tenant's obligations under Section 6.1.

**6.4 PLATE GLASS INSURANCE:** Tenant shall keep and maintain in force during the Term hereof, plate glass insurance upon windows and doors in the Premises, delivering certificates of such insurance to Landlord.

**6.5 PROPERTY, BUSINESS INTERRUPTION, AND OTHER INSURANCE:** Tenant agrees to procure and maintain at its own expense throughout the Term policies of fire and windstorm insurance, with extended coverage endorsement, and such other insurance as Landlord may require, on all fixtures and equipment installed by Tenant in the Premises, such insurance to be in an amount equal to one hundred percent (100%) of the insurable value thereof. All proceeds of such insurance shall be held in trust to be used for repair or replacement of the fixtures and equipment so insured. Tenant further covenants and agrees to procure and maintain at its own expense throughout the Term, unless notified to the contrary by Landlord: (a) policies of insurance against the business interruption of Tenant in amounts adequate to insure the payment of rent to Landlord as reserved under the terms of this Lease in the event of loss due to any of the perils insured against under the terms of the fire, windstorm, and extended

11

coverage insurance required to be carried under the terms of this Lease; (b) all policies of insurance which may be required by virtue of the nature of Tenant's operation on the Premises, including, but not limited to, Worker's Compensation Insurance, which insurance shall be procured from an insurance carrier and in such amounts as are in compliance with applicable state law; (c) policies of insurance in an amount adequate to insure the accurate reproduction of Tenant's business records, valuable papers, files and memoranda in the event of loss due to any of the perils insured against under the terms of the fire, windstorm, and extended coverage insurance required to be carried by Tenant under the terms of this Lease; (d) policies of insurance in an amount equal to the replacement cost of all boilers, machinery and equipment on the Premises, whether or not owned by Tenant, in the event of damage to or destruction of all or any portion of said boilers, machinery or equipment due to any of the perils insured against under the terms of the fire, windstorm and extended coverage insurance to be carried by Tenant under the terms of this Lease; (e) products liability and completed operations policies of insurance in the names of Landlord and Tenant in an amount not less than Two Million and No/100 Dollars ($2,000,000.00) for death and/or bodily and personal injury to persons for each occurrence and not less than Two Million and No/100 Dollars ($2,000,000.00) for injuries to any one person. Tenant shall deliver to Landlord certificates of all insurance required under this Section 6.5, which certificates shall declare that the respective insurer may not cancel the same in whole or in part without giving Landlord written notice of its intention to do so at least thirty (30) days in advance.

**6.6 DRAM SHOP INSURANCE:** In the event that at any time during the Term or any extension or renewal thereof, beer, wines or other alcoholic liquors or beverages are sold or given away upon or from the Premises (it being understood and agreed, however, that the foregoing provision shall not authorize the use of the Premises for such purposes without the express consent of the Landlord being set forth otherwise in the Lease), Tenant shall, at its sole expense, obtain, maintain and keep in force, adequate Dram Shop Insurance protecting both Tenant and Landlord in connection therewith the policy limits covering the full amount of potential liability provided for from time to time under the laws of the State in which the Premises are located. Said policies shall be in such companies as are authorized to write such coverage in such State, shall be acceptable to Landlord and/or its lenders or ground lessors (which shall be named as an additional insured if requested in writing) and copies shall be maintained on file with Landlord, and shall contain non-cancelable clauses unless Landlord is given at least thirty (30) days' notice of such proposed cancellation. In the event Tenant shall fail to procure such insurance where applicable Landlord may procure the same and in the event Landlord shall be unable to procure the same (all at Tenant's expense) then sales of the foregoing products shall be suspended until such coverage is again in force.

**6.7 FAILURE TO PROCURE INSURANCE:** All insurance shall be issued by insurers with a general policy rating of Grade A or better and a financial rating of not less than Class VII as rated in the most current available Best Insurance Reports and who is qualified to do business in the state in which the Premises are located, shall be primary and non-contributing, and shall otherwise be acceptable to Landlord in form and content. Certificates of all insurance required to be procured and maintained by Tenant in compliance with its obligations under this Article shall be delivered to Landlord at least fifteen (15) days prior to the time such insurance is first required to be carried by Tenant, and thereafter at least fifteen (15) days prior to the expiration of any such insurance. In the event Tenant shall fail to procure insurance required under this Article and fail to maintain the same in force continuously during the Term, Landlord shall be entitled to procure the same and Tenant shall immediately reimburse Landlord for such premium expense.

**6.8 INCREASE IN FIRE INSURANCE PREMIUM:** Tenant agrees not to keep upon the Premises any articles or goods which may be prohibited by Landlord's fire and extended or all-risk coverage insurance policy. It is agreed between the parties that in the event the insurance rates applicable to fire and extended for all-risk coverage insurance covering the Premises or any other portion of the Shopping Center shall be increased by reason of any use of the Premises made by the Tenant, then Tenant shall pay to Landlord such increase in insurance from time to time upon demand. Tenant agrees to pay to Landlord forthwith upon demand the amount of any increase in premiums for insurance against loss by fire or any other peril normally covered by fire and extended or all risk coverage insurance that may be charged during the Term on the amount of insurance to be carried by Landlord on the Shopping Center, or any portion thereof, resulting from the foregoing or from Tenant doing any act in or about the Premises which does so increase the insurance rates, whether or not Landlord shall have consented to such act on the part of Tenant. If Tenant installs upon the Premises any electrical equipment which constitutes an overload of the electrical lines of the Premises, Tenant shall at its sole cost and expense make whatever changes or provide whatever equipment safeguards are necessary to comply with the requirement of the insurance underwriters and any governmental authority having jurisdiction thereover but nothing herein contained shall be deemed to constitute Landlord's consent to such overloading.

**6.9 PROPERTY OF TENANT:** Tenant agrees that all property owned by it in, on or about the Premises shall be at the sole risk and hazard of the Tenant. Landlord shall not be liable or responsible for any loss of or damage to Tenant, or anyone claiming under or through Tenant, or otherwise, whether caused by or resulting from a peril required to be insured hereunder, or from water, steam, gas, leakage, plumbing, electricity or electrical apparatus, pipe or apparatus of any kind, the elements or other similar

12

or dissimilar causes, and whether or not originating in the Premises or elsewhere, irrespective of whether or not Landlord may be deemed to have been negligent with respect thereto, and provided such damage or loss is not the result of an intentional and willful wrongful act of Landlord.

**6.10 WAIVER OF SUBROGATION:** Tenant agrees that, if any property owned by it and located in the Premises shall be damaged or destroyed by an insured peril, Landlord shall not have any liability to Tenant, nor to any insurer of Tenant, for or in respect of such damage or destruction, and Tenant shall require all policies of risk insurance carried by it on its property in the Premises to contain or be endorsed with a provision in and by which the insurer designated therein shall waive its right of subrogation against Landlord.

**A R T I C L E   V I I**
**FIRE OR OTHER CASUALTY**

**7.1 DESTRUCTION BY FIRE OR CASUALTY:**

(a)  In the event the Premises or any part thereof shall be damaged by fire or explosion, then Landlord shall, to the extent of the net insurance proceeds available therefore, repair such damage and put the Premises in good condition as rapidly as reasonably possible, Tenant shall promptly thereafter restore and reinstall its trade fixtures, furnishings, furniture, equipment and other personal property. Tenant waives the provisions of any applicable law pertaining to the effect upon a lease of damage or destruction to the demised premises, including without limitation any right to terminate the Lease, and hereby agrees that the terms and provisions of this Article VII are intended to set forth the sole rights and remedies of the parties in the event of damage or destruction to the Premises or the Shopping Center.

(b)  Intentionally deleted.

(c)  Notwithstanding any other provision of this Section to the contrary, if the Premises shall be damaged, and such damage shall be to the extent of more than fifteen percent (15%) of the replacement value of the Premises at the time of such damage, or if the Shopping Center or any portion thereof shall be damaged, and such damage shall be to the extent of more than fifteen percent (15%) of the replacement value thereof at the time of such damage, or if any damage to the Premises or Shopping Center shall result from a cause not covered by the insurance maintained by Landlord, or if the Premises or Shopping Center shall be damaged by any cause whatsoever during the last year of the Term and Tenant shall not be able to operate for a period of sixty (60) or more days as a result of such damage, then Landlord or Tenant may at their election, upon notice to the other, within ninety (90) days after such damage, terminate this Lease as of the date of such damage.

**A R T I C L E   V I I I**
**ASSIGNMENT AND SUBLETTING**

**8.1 TENANT ASSIGNMENT:**

(a)  Tenant shall not assign, transfer or encumber this Lease, and shall not sublet or allow any other tenant to come in with or under Tenant (all of the foregoing being referred to as a **"transfer"**) without Landlord's prior written consent in each and every instance, which consent may be withheld by Landlord in its sole and absolute discretion. Consent of Landlord to one transfer shall not constitute a waiver of Landlord's rights with respect to any other transfer.

(b)  In no event shall Tenant transfer the Premises for any use other than that set forth in Section 4.1 or which will violate the exclusive use rights granted to any other tenant in the Shopping Center. No transfer, notwithstanding the consent of the Landlord thereto, shall in any manner release the transferring Tenant from its continued liability for the performance of the provisions of this Lease and any amendments or modifications, except that Landlord may approve the transfer of the Premises to a 100% purchaser of Tenant upon satisfaction that the proposed purchaser's financial condition (including ,without limitation, with respect to assets, liquidity, liabilities and contingent liabilities) is equal to or is greater than and is better than Tenants' financial condition at the time the lease is executed and at the time of the assignment and such approval shall not be unreasonably withheld. The acceptance of any rental payments by Landlord from any alleged transferee shall not constitute approval by Landlord of the assignment of the purported transfer.

(c)  Tenant agrees that fifty percent (50%) of all sums of any nature whatsoever, including without limitation, Minimum Rent, Common Area charges and charges for taxes, assessments and insurance premiums received by it from any transferee in any month during the Term or any extension thereof, in excess of the aggregate of all sums due Landlord under the terms of this Lease for the same month shall be paid to Landlord as Additional Rent within ten (10) days after the end of such month. With such payment, Tenant shall prepare and deliver to Landlord, at the place where rent is then required

13

to be paid hereunder, a written statement, signed by Tenant's duly authorized officer or representative showing in reasonable detail the elements and amounts of such items. In addition, Tenant shall prepare and deliver to Landlord within thirty (30) days after the end of each Lease Year and within thirty (30) days after the end of the Term, at the place where rent is then required to be paid hereunder, a complete, annual statement, prepared by a licensed accountant and signed by Tenant's duly authorized officer or representative, showing in reasonable detail the elements and amounts of such sums received from any transferee during the preceding Lease Year or fraction thereof. The acceptance of such Additional Rent from Tenant or any other person shall not be deemed to be a waiver of any of the provisions of the Lease or a consent to the transfer of the Premises.

(d)    Any sale, issuance or transfer of any part or all of the stock, partnership, membership or other ownership interests in Tenant which results in a transfer of more than fifty one percent (51%) of the aggregate ownership interests in Tenant (other than a transfer to a person or entity that controls, is controlled by, or is under common control with, Tenant prior to such transfer) shall be deemed an assignment to which the provisions of this Article apply.

(e)    Upon making any request for Landlord's consent pursuant to this Article, Tenant shall promptly pay to Landlord, on demand, the greater of (i) Five Hundred and No/100 Dollars ($500.00), and (ii) all reasonable costs, expenses and reasonable attorneys' fees that may be incurred or paid by Landlord in processing, documenting or administering such request by Tenant .

**8.2 MINIMUM TRANSFER RENTALS:** Notwithstanding that the Landlord may consent thereto, it is agreed that in the event of any transfer the rental that shall be due from the transferee (and that shall continue to be due from the Tenant as provided) shall not be less than the aggregate of all annual sums paid by the Tenant in the year immediately prior to the date of said transfer, including various Additional Rents that may have become due hereunder, payable at the rate of one twelfth (1/12th) of the aggregate of said sums on the first day of each month in advance.

**8.3 BANKRUPTCY, ETC.:** Neither this Lease, nor any interest therein, nor any estate created hereby, shall pass to any trustee or receiver in bankruptcy, nor to any other receiver or assignee for the benefit of creditors or otherwise by operation of law. In the event of bankruptcy or assignment for the benefit of creditors, Landlord shall be entitled to retain the security deposit and shall be deemed a secured creditor as to the next six (6) months' rental to the extent permitted by the applicable federal or state laws unless a replacement tenant paying at least the amount due from Tenant shall be procured in said period. As to any additional loss of rent, Landlord shall be entitled to file as a general creditor.

## ARTICLE IX
### DEFAULT AND RE-ENTRY

**9.1 TENANT'S DEFAULT:** Each of the following shall be deemed an event of default under this Lease: (a) failure on the part of Tenant to pay rent or Additional Rent as and when the same shall become due, (b) the occurrence of a transfer (as such word is defined in Section 8.1(a) without Landlord's prior consent, or (c) a breach by Tenant of a covenant, condition, agreement or obligation of this Lease on the part of Tenant to be kept and performed, for more than twenty (20) days after written notice of such default shall have been given to Tenant (such notice being in lieu of, and not in addition to, any notice required by law).

**9.2    LANDLORD'S REMEDIES:** Upon an event of default by Tenant, Landlord may, at its option:

(a)    terminate Tenant's right to possession of the Premises and recover from Tenant, in addition to its other remedies:

(i)  the worth at the time of award of any unpaid rent which has ~~become due~~ been earned at the time of such termination; plus

(ii)  the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(iii)  the worth at the time of award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(iv)  any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new

tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant; and

(v)  at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term "rent" as used in this Section 9.2 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Sections 9.2(a)(i) and (ii) above, the "worth at the time of award" shall be computed by allowing interest at the Applicable Rate. As used in Section 9.2(a)(iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

(b)    continue this Lease in effect without terminating Tenant's right to possession, in which event Landlord may enforce all of its rights and remedies under this Lease, including the right to collect rent as it becomes due;

(c)    without terminating this Lease, make such alterations and repairs as may be necessary to relet the Premises; or

(d)    declare the forfeiture of this Lease and terminating all of Tenant's rights hereunder, without, however, releasing Tenant from liability.

No reentry, acts of preservation or maintenance, reletting of the Premises or the filing of any unlawful detainer action shall be construed as an election by Landlord to terminate this Lease. Landlord shall not be deemed to have accepted any surrender of the Premises or of the leasehold estate created hereby from Tenant, or anyone acting in Tenant's behalf, unless Landlord, by an agreement in writing, shall declare explicitly that it intends thereby to effect acceptance of the surrender and to release Tenant from liability. In addition to any other rights of Landlord set forth in this Lease, if Tenant at any time fails to perform any of its obligations under this Lease, Landlord shall have the right, but not the obligation, upon giving Tenant at least ten (10) days written notice (except in the event of emergency), to perform such obligations on behalf of and for the account of Tenant; in such event, Tenant shall reimburse Landlord for its costs and expenses incurred in so performing. In addition to any late charges specified elsewhere, all rent or other sums not paid when due under this Lease shall bear interest at the Applicable Rate.

**9.3  NO LIMITATION:** Notwithstanding the provisions of this Lease, it is agreed between the parties that the remedies provided for herein for an event of default on the part of Tenant are in addition to and not in lieu of any other remedies or relief made available under the laws of the state in which the Premises are located, including, without limitation, the right to obtain injunctive relief and recover damages caused by Tenant's default.

**9.4  ATTORNEYS' FEES:** In the event that Landlord shall be required to engage legal counsel for the collection of rent, unlawful detainer, or enforcement of this Lease, whether such employment shall require institution of suit or other legal services required to secure compliance on the part of Tenant, Tenant shall be responsible for and shall promptly pay to Landlord the reasonable value of said attorneys' fees.

## A R T I C L E   X
### COMMON AREAS; RELOCATION

**10.1  CONTROL OF COMMON AREAS:** All parking areas, driveways, entrances and exits thereto, sidewalks, ramps, landscaped areas, exterior stairways, restrooms, elevators, escalators, and all other Common Areas and facilities provided by Landlord for the common use of tenants of the Shopping Center and their officers, agents, employees and customers, shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right from time to time to establish, modify and enforce reasonable rules and regulations with respect to the use of all such Common Areas and facilities. Landlord shall have the right to operate and maintain the same in such manner as Landlord, in its sole discretion, shall determine from time to time, including without limitation the right to employ all personnel and to make all rules and regulations pertaining to and necessary for the proper operation and maintenance of said Common Areas and facilities. Tenant is not permitted to place or install anything in the Common Area, i.e., signs, pay telephones, furniture, etc. Landlord shall have the exclusive right at any and all times (except that in non-emergency situations Landlord is required to provide Tenant with fifteen (15) days written notice of Landlord's intent to close common areas that would have an adverse effect on access to the Premises) to alter, construct, re-construct, enlarge, contract, modify or relocate any of the Common Areas, to close any portion of the Common Areas for the purpose of making repairs, changes or additions thereto and may change the size, area, layout or arrangement of the parking areas or the number of spaces or the lighting thereof, within or adjacent to the existing areas and

15

may enter into agreements with adjacent owners for cross-easements for parking, ingress or egress. In the event that the lighting controls for the Common Areas shall be located in the Premises, then Landlord in such event shall have the right to enter the Premises of the Tenant for the purpose of adjusting or otherwise dealing with the said controls as required. Landlord shall also have the right to place vending or amusement devices in the Common Areas, to utilize the Common Area for promotions, exhibits, rides, shows, displays, kiosks, carts, food facilities, decorative items and landscaping, and any other use which, in Landlord's judgment, tends to attract customers to, or benefit the customers of, the Shopping Center.

**10.2 EMPLOYEE PARKING AREA:** Tenant and its employees shall park their motor vehicles in such areas as Landlord shall from time to time designate as employee parking areas. Tenant agrees that all loading and unloading of goods shall be made at such places as are designated by Landlord and that said loading and unloading operations shall be conducted so as not to obstruct or hinder the operation of the businesses of the other tenants in the Shopping Center, nor will Tenant unreasonably block or obstruct any street, sidewalk or right-of-way adjacent to or comprising part of the Shopping Center. Upon request of the Landlord, Tenant will furnish to Landlord the license numbers of any vehicle belonging to Tenant or its employees and in the event any of such vehicles shall be parked in areas other than those designated for employee parking, the Tenant shall pay to Landlord forthwith on demand an amount equal to Twenty-Five and No/100 Dollars ($25.00) per day for each day, or part thereof, that each such vehicle is parked in such non-designated areas. Tenant shall be given by Landlord reasonable notice of Landlord's intent to charge Tenant the Twenty-Five Dollar fee on the first occasion.

**10.3 RELOCATION:** Landlord shall have the right, upon ninety (90) days notice to Tenant, to relocate the Premises to another space in the Shopping Center of similar size, dimensions and configuration as the Premises. Such relocation shall be performed by Landlord at Landlord's expense, and Landlord shall bear Tenant's reasonable incidental costs resulting from such relocation (such as costs of stationary, business cards and other similar items) in an amount not exceeding Five Hundred and No/100 Dollars ($500.00). Landlord shall also be responsible for Tenant's moving costs and the cost of re-constructing Tenant Improvements in the new space and agrees to put the relocated space in substantially the same condition as the Premises. In the event the Floor Area of the relocated Premises is different than that of the original Premises, Minimum Rent shall be reduced proportionally.

## A R T I C L E   X I
### EMINENT DOMAIN

**11.1 AWARD:** In the event the Premises, or any part thereof, or if any part of the Shopping Center shall be taken or damaged by eminent domain or similar proceedings, the entire condemnation award or awards shall belong to the Landlord, except that Tenant shall be entitled to the portion of any award, if any, allocated by the condemning authority to the taking of or damage to Tenant's trade fixtures and equipment.

**11.2 RIGHT TO CANCEL:** If by reason of such taking or damage, any tenant or occupant occupying more than ten thousand (10,000) square feet of building area in the Shopping Center cancels its lease or abandons its premises, then Landlord may cancel this Lease by giving written notice to the Tenant within sixty (60) days after said tenant or occupant occupying more than ten thousand (10,000) square feet of building area cancels its lease or abandons its Premises.

**11.3 TAKING OF PREMISES OR OTHER PORTIONS OF SHOPPING CENTERS:** In the event that more than twenty percent (20%) of the Floor Area of the Premises, or if more than fifty percent (50%) of the area of the Shopping Center shall be so taken or condemned, then either Landlord or Tenant shall have the mutual option of terminating this Lease upon giving written notice of such election to the other within thirty (30) days after possession of the part condemned has been taken by proper authorities, whereupon the Term shall be terminated as of the date on which possession is so taken. If neither Landlord nor Tenant so elects to terminate this Lease, or if twenty percent (20%) or less of the Floor Area of Premises or fifty percent (50%) or less of the area of the Shopping Center shall be so taken or condemned, Landlord at its own expense and to the extent of the net condemnation proceeds available for such purpose, shall repair and restore the Premises not affected by the taking and the Minimum Rent to be paid by Tenant shall be equitably and proportionately reduced in the same proportion that the Floor Area of the Premises so taken bears to the Floor Areas' demised to Tenant immediately prior to the time of such taking. Any taking or condemnation of less than fifty percent (50%) of the areas of the Shopping Center other than the Premises shall not result in any reduction or diminution of the rental payable hereunder.

## A R T I C L E   X I I
### GENERAL PROVISIONS

**12.1 LANDLORD'S RIGHT OF ENTRY:** Landlord reserves the right at all reasonable

16

times during the Term for Landlord or Landlord's agents and upon two (2) business days written notice, except in the case of an emergency, to enter the Premises for the purpose of inspecting and examining the same, and to show the same to actual or prospective purchasers, partners, lenders, investors or tenants, and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable, and for any other purposes Landlord deems necessary. During the ninety (90) days prior to the expiration of the Term or any renewal term, Landlord may exhibit (in such a way that does not distract from Tenants business and décor) the Premises to prospective tenants or purchasers, and place upon the Premises customary 'For Sale' or 'For Lease' signs, as the case may be, which signs Tenant shall permit to remain thereon without molestation. If Tenant shall not be personally present to open and permit entry into said Premises, at any time, when for any reason an entry therein shall be necessary or permissible, Landlord or Landlord's agents may forcibly enter the same, without rendering Landlord or such agents liable therefor, and without any manner affecting the obligations and covenants of this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever for the care, maintenance or repair of the Premises or any part thereof, except as otherwise herein specifically provided. No exercise by Landlord of any rights under this Section 12.1 shall entitle Tenant to any damages for inconvenience, disturbance, constructive eviction, loss of business or other damage to Tenant occasioned thereby, nor to any abatement of rent.

**12.2 QUIET ENJOYMENT:** Landlord agrees that, if the rent is being paid in the manner and at the time prescribed and the covenants and obligations of Tenant being all and singular kept, fulfilled and performed, Tenant shall lawfully and peaceably have, hold, possess, use and occupy and enjoy the Premises so long as this Lease remains in force, without hindrance, disturbance or molestation from Landlord, subject to the specific provisions of this Lease.

**12.3 WAIVER:** Waiver by Landlord of any default, breach or failure of Tenant under this Lease shall not be construed as a waiver of any subsequent or different default, breach or failure. In case of a breach by Tenant of any of the covenants or undertakings of Tenant, Landlord nevertheless may accept from Tenant any payment or payments hereunder without in any way waiving Landlord's right of re-entry hereinbefore provided for by reason of any other breach or lapse which was in existence at the time such payment or payments were accepted by Landlord.

**12.4 TRADE FIXTURES:** Prior to the expiration or termination of this Lease, provided Tenant is not in default, Tenant shall have the right to remove any trade fixtures installed by Tenant on the Premises in accordance with Section 5.3. Notwithstanding the foregoing, Landlord shall have a lien upon said fixtures during the Term as set forth in Section 12.11.

**12.5 SUBORDINATION:** Upon written request of Landlord, Tenant shall make, execute, acknowledge and deliver (a) any and all instruments reasonably requested by Landlord which are necessary or proper to effect the subordination of this Lease to any mortgage, deed of trust, indenture or other encumbrance, or at the election of Landlord, to cause such mortgage or other encumbrance to be subordinated to this Lease, and (b) any instruments of attornment requested by any purchaser of the Premises. The Lease and all of Tenant's rights hereunder are and shall be subject and subordinate to any reciprocal easement agreement or other recorded instrument affecting the Shopping Center, and any amendments or modifications thereof. If any such reciprocal easement agreement or other agreement affecting the Shopping Center is not of record as of the date hereof, then this Lease shall automatically become subordinate thereto upon recordation thereof, and within ten (10) days after the receipt of a request from Tenant or any Mortgagee, Tenant shall confirm such subordination by executing a recordable subordination agreement in form and content satisfactory to Landlord. Tenant hereby irrevocably appoints Landlord as Tenant's attorney-in-fact with the sole power to make, execute, acknowledge and deliver any such instruments in the name and on behalf of Tenant. Notwithstanding any other provision of this Section 12.5, however, should the Premises be purchased or otherwise acquired by any person or entity in connection with any sale or other proceeding under the terms of any such mortgage, deed of trust, indenture or other encumbrance, such person or entity may elect to continue this Lease in full force and effect in the same manner and with like effect as if such person or entity had been named as Landlord herein, and in the event of such election, this Lease shall continue in full force and effect, as aforesaid, and Tenant hereby attorns and agrees to attorn to such person or entity.

**12.6 OFFSET CERTIFICATES:** At any time and from time to time, Tenant agrees upon request in writing from Landlord to execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Minimum Rent, and other charges have been paid, and that the terms, covenants and conditions required of Landlord to be performed under this Lease have been so performed, and that there are no existing defenses or offsets by Tenant against the enforcement of this Lease by Landlord, and containing any other reasonably requested information. It is understood and agreed that any such certificate may be relied upon by Landlord and any other party designated by Landlord, including any actual or prospective purchaser, investor, partner, lender, ground lessor, mortgagee, or beneficiary with respect to the Premises or

Shopping Center.

**12.7 NOTICES:** All notices, demands, requests, approvals or other communications which may be or are required to be sent by either party to the other under this Lease shall be deemed given when deposited in U.S. regular mail, registered mail, or when delivered by courier or overnight delivery service, addressed as set forth in Section 1.1(a) or (b), as the case may be, or to such other address or addresses as either party may designate by notice to the other in accordance with this Section. Notices delivered by regular mail shall be deemed delivered two (2) business days after deposit thereof in a U.S. Mail Post Box. All other notices shall be deemed delivered as of the date of delivery (or attempted delivery or rejection) established by U.S. Post Office return receipt or the overnight courier's proof of delivery, as this case may be, but in no event later than two (2) business days after deposit thereof in a U.S. Mail Post Box or with a courier or delivery service. The information regarding "Tenant's Contact Person" in Section 1.1(b) is for lease administration purposes only and shall not create, or interpreted to be, a requirement or obligation on Landlord's part to send any notice or other communications to such person or in accordance with such information.

**12.8 RECORDING:** Neither this Lease nor any memorandum thereof shall be recorded except as the request of Landlord.

**12.9 AMENDMENT:** Oral agreements in conflict with any of the terms of this Lease shall be without force and effect, all amendments to be in writing executed by the parties or their respective successors in interest.

**12.10 FINANCING:** It is understood and acknowledged that Landlord intends from time to time to finance or refinance the Shopping Center through a mortgage loan, construction loan, or other loans or financing from one or more lenders and that, as a condition to such loans, the lender may request the amendment or modification of this Lease. In view of the foregoing, if Tenant should refuse to execute any amendment or modification so required within thirty (30) days after receipt of same, Landlord shall have the right by notice to Tenant to terminate this Lease without liability to either party of any kind of amount and upon such termination Landlord shall refund any unearned rental or security deposit made pursuant to the provisions of Section 3.7. No expenditure of any sum or incurring of any liability by Tenant for architectural, design, or engineering services, merchandise, fixtures, equipment, labor, materials or otherwise shall affect the rights of Landlord hereunder or give rise to any claim by Tenant for reimbursement thereof.

**12.11 INTENTIONALLY DELETED**

**12.12 INTENTIONALLY DELETED**

**12.13 CENTER PROMOTIONS:** Tenant agrees to participate in and to pay its prorata share of all center-wide promotions including cooperative advertising employed in connection with the said promotions.

**12.14 HOLDING OVER:** If Tenant remains in possession of the Premises, or any part thereof, after expiration of this Lease, unless otherwise agreed in writing, such continued possession shall, if rent is paid by Tenant and accepted by Landlord, create a month-to-month tenancy on the terms and conditions herein specified, except that the Minimum Rent shall be an amount equal to one-hundred twenty five percent (125%) of the Minimum Rent payable by Tenant for the last full month for which Minimum Rent is required to be paid prior to the expiration of this Lease. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other rights and remedies available to Landlord accruing therefrom, Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any loss or liability resulting from such failure, including without limitation, any claims made by any succeeding Tenant based upon Tenant's failure to surrender. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other rights and remedies available to Landlord accruing therefrom, Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any loss or liability resulting from such failure, including without limitation, any claims made by any succeeding Tenant based upon Tenant's failure to surrender.

**12.15 NO PARTNERSHIP:** It is understood that Landlord does not in any way or purpose become a partner or joint venturer with Tenant in the conduct of Tenant's business.

**12.16 PARTIAL INVALIDITY:** If any term or condition of this Lease or the application thereof to any person or event shall to any extent be invalid or unenforceable, the remainder of this Lease in the application of such term, covenant or condition to persons or events other than those to which it is held invalid or unenforceable shall not be affected and each term, covenant and condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**12.17 SUCCESSORS:** The provisions, covenants and conditions of this Lease shall bind and inure to the benefit of the legal representatives, successors and assigns of each of the parties, except that

18

no assignment or subletting by Tenant without the written consent of Landlord shall vest any right in the assignee or sublessee of Tenant.

**12.18 DEFAULT BY LANDLORD:** Landlord shall in no event be charged with default in the performance of any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days (or such additional time as is reasonably required to correct any such defaults) after written notice by Tenant to Landlord properly specifying wherein Landlord has failed to perform any such obligation.

**12.19 RIGHTS OF LENDERS:** Notwithstanding anything to the contrary in this Lease, Landlord shall not be in default under any provision of this Lease unless written notice specifying such default is mailed to Landlord and to all mortgagees, and trust deed holders of which Tenant has, prior to such notices, been notified in writing. Landlord agrees that any such mortgagee or trust deed holder shall have the right to cure such default on behalf of Landlord within sixty (60) calendar days after receipt of such notice. Tenant further agrees not to invoke any of its remedies under this Lease unless said sixty (60) days have elapsed, nor during any longer period that such mortgagee or trust deed holder is proceeding to cure such default with due diligence, or is taking steps with due diligence to obtain the legal right to enter the Shopping Center or the Premises to cure the default.

**12.20 WAIVER OF LIABILITY:** Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of the Landlord in the land and buildings comprising the Shopping Center and/or building of which the Premises are a part, and, subject to prior rights of any mortgage of the Premises, for the collection, satisfaction or enforcement of any judgment (or other judicial or administrative process) requiring the payment of money or the performance or nonperformance of certain acts by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no other assets of the Landlord shall be subject to levy, execution or other procedures for the satisfaction of any remedy, judgment or other order of Landlord. If Landlord transfers this Lease, except as collateral security for a loan, upon such transfer Landlord will be released from all liability and obligation hereunder. It is further understood by Tenant that Landlord may not now or in the future own all of the Shopping Center in which the Premises are located. Tenant agrees not to cancel this Lease, reduce or abate its rents or pursue any other remedies under this Lease for any violation of this Lease occurring by virtue of any act or omission on or with respect to property not owned by Landlord. No officer, partner, employee, advisor, trustee, director, beneficiary, shareholder, manager, participant or member of Landlord shall be liable for any obligation under this Lease. No default by Landlord under this Lease shall give Tenant the right to terminate this Lease.

**12.21 EXECUTION OF LEASE:** The submission of this Lease for examination does not constitute a reservation of or option for the Premises and this Lease becomes effective as a Lease only upon execution and delivery thereof by Landlord and Tenant. If Tenant is a corporation, Tenant shall promptly furnish Landlord certified corporate resolutions attesting to the authority of officers to execute this Lease on behalf of such corporation.

**12.22 APPLICABLE LAW:** The laws of the state in which the Premises are located shall govern the validity, performance and enforcement of this Lease.

**12.23 GENDER AND INTERPRETATION OF TERMS AND PROVISIONS:** As used in this Lease and whenever required by the context thereof, each number, both singular and plural, shall include all numbers, and each gender shall include all genders. Landlord and Tenant as used in this Lease or in any other instrument referred to in or made a part of this Lease shall likewise include both the singular and the plural, a corporation, partnership, individual, firm or person acting in any fiduciary capacity as executor, administrator, trustee, or in any other representative capacity or any other entity. All covenants herein contained on the part of Tenant and Landlord shall be joint and several.

**12.24 ASSIGNMENT BY LANDLORD:** Notwithstanding any of the provisions of this Lease, Landlord (a) may assign, in whole or in part, Landlord's interest in this Lease, and (b) may sell all or part of the Shopping Center.

**12.25 PARAGRAPH HEADINGS:** The article and Section titles herein are for convenience only and do not define, limit or construe the contents of such articles or Sections.

**12.26 TIME OF ESSENCE:** Time is hereby expressly declared to be of the essence of this Lease and of each and every covenant, term, condition and provision hereof. If any period of time shall end on a weekend or holiday on which banks are closed in the state in which the Premises are located, such period shall be extended to the next succeeding business day.

**12.27 BROKERS.** Except as expressly provided below, each party represents and warrants that it has engaged no broker or finder and that no claims for brokers' or finders' fees will arise in connection with the execution of this Lease, and agrees to indemnify, defend and hold harmless the other

19

party from any breach of such representation and warranty. Landlord agrees to pay any brokerage commissions, fees or other compensation due to the Brokers listed in Section 1.1(n) of this Lease, pursuant to the terms of a separate written agreement(s) between Landlord and said Brokers.

## ARTICLE XIII
### RULES AND REGULATIONS

**13.1 RULES AND REGULATIONS:** Tenant shall comply with the rules and regulations attached to this Lease as <u>Exhibit E,</u> as modified or supplemented by Landlord from time to time.

## ARTICLE XIV
### ADVERTISING

**14.1 ADVERTISING OF TENANT:** Tenant, at its sole cost and expense, agrees to refer to the Shopping Center by the name set forth in Section 1.1(c) in designating the location of the Premises in all newspaper or other advertising, stationery, or other printed material and all other references to location, to include the address and identity of its business activity in the Premises in all advertisements made by Tenant in which the address and identity of any other business activity of like character conducted by Tenant within the city or trade area in which the Shopping Center is located shall be mentioned, and to use in such advertising only Tenant's trade name as set forth in Section 1.1(m). Tenant shall not change said trade name without Landlord's prior written consent, which consent shall not be unreasonably withheld.

## ARTICLE XV
### FINANCIAL STATEMENT

**15.1 TENANT'S FINANCIAL STATEMENT:** Within fifteen (15) days of the date hereof and from time to time upon reasonable request of Landlord, Tenant shall deliver to Landlord its full and complete, current financial statement and that of each of its guarantors, if any. If Tenant is a partnership, in addition to the above, it shall deliver to Landlord the full and complete, current financial statement of each of its general partners.

## ARTICLE XVI
### HAZARDOUS MATERIALS

**16.1 HAZARDOUS MATERIALS:** Tenant shall not cause or permit any **"Hazardous Materials"** (which, as used herein, shall mean any hazardous, toxic or radioactive substance, material or waste which is or becomes regulated by any federal, state or local law, rule, regulation, order or ordinance, including but not limited to, asbestos and petroleum-containing materials) to be brought upon, kept or used in the Premises or Shopping Center by Tenant or any of its agents, employees or contractors, except for incidental quantities of commonly-used office supplies and cleaning solvents which are used and stored at all times in a manner that complies with legal requirements law and sound practices of retail operation and except used by Tenant in the normal course of its business allowed under this Lease. In the event of breach or default by Tenant under this Article, Tenant shall indemnify, defend, hold harmless and protect Landlord and the Shopping Center from and against all losses, claims, damages, judgments, penalties, fines, and costs (including, but not limited to, reasonable attorneys' fees and costs) arising from or in any way related to such breach or default, including, but not limited to, any costs incurred in connection with the investigation of site conditions or any clean-up, remedial, removal or restoration work required by any governmental agency or subdivision. Tenant shall promptly take all actions, at its sole cost and expense, as are necessary to return the Premises and/or Shopping Center to the condition existing prior to the introduction of such Hazardous Materials, provided that Landlord's prior written approval of all such actions shall be first obtained. Tenant shall immediately notify Landlord of any inquiry, test, investigation or enforcement proceeding by or against Tenant or the Premises concerning the presence of Hazardous Materials. Landlord, at its election, shall have the sole right, at Tenant's cost and expense, to negotiate, defend, approve and appeal any action taken or order issued by any governmental authority with regard to the presence of Hazardous Materials. In the event Landlord determines that Tenant's permitted use may involve the handling, storage or disposal of Hazardous Materials, Landlord shall have the right upon reasonable prior notice during normal business hours (except in cases of emergency where no notice shall be required) to enter the Premises from time to time to inspect and monitor Tenant's use of such Hazardous Materials, and Tenant shall pay, as Additional Rent, an annual fee for such inspections and monitoring in such amount as may be determined by Landlord in its sole discretion. The provisions of this Article shall survive the termination of this Lease or expiration of the Term. If Tenant, as part of its retail business as permitted under this Lease, uses any Hazardous Materials, Tenant shall use them strictly in accordance with applicable environmental laws and regulations.

## ARTICLE XVII
### OTHER PROVISIONS

**17.1 TENANT'S WAIVER:** Landlord and Tenant agree and acknowledge that there are no oral agreements between the parties hereto affecting this Lease, and the Lease and any Amendments subsequent thereto cancel any and all previous negotiations, arrangements, representations, brochures, agreements and understandings, if any, between the parties hereto or displayed or given by Landlord to Tenant with respect to the subject matter hereof, and none thereof shall be used to interpret or construe the Lease or any subsequent Amendment to the Lease unless the same shall be in writing and acknowledged by Landlord and Tenant.

**17.2 CONFIDENTIALITY OF LEASE TERMS:** Tenant covenants it shall not discuss with or release to any third party, in particular any other past, present or future tenant of the Shopping Center any information relative to the terms and conditions of this Lease or any subsequent amendment thereto, excepting Tenant's attorney, banking institution or financial advisor, or lender. Any breach of this covenant shall constitute a non-curable event of default hereunder.

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease as of the day and year first above written.

LANDLORD:

POWDER BASIN SHOPPING CENTER, LLC, a
Delaware limited liability company

By:
Name _Steven Usdan_
Title: _Managing Member of_
CCA Acquisition Company, LLC,
a California limited liability company
the Managing Member

TENANT:

FINGER LICKIN' BRANDS, LLC, Series _____, a
Utah series limited liability company

By:
Its: _John Thomson_

21

EXHIBIT A

SITE PLAN

**POWDER BASIN**
2610 S. Douglas Highway
Gillette, Wyoming 82718

DICKEY'S BBQ

LOD

<u>EXHIBIT B</u>

<u>DESCRIPTION OF LANDLORD'S WORK</u>

<u>Base Building Improvements</u>
<u>(to be provided at Landlord's sole cost and expense)</u>

- Demising Walls
- Façade Storefront Windows
- New HVAC Units-15 Tons-not distributed
- 1,000 gallon grease interceptor
- 400 Amp Electrical Service

**EXHIBIT C-1**
**RECEIPT FOR KEY DELIVERY AND**
**ACCEPTANCE OF OCCUPANCY OF THE PREMISES**

I, _____, acknowledge I have received the keys and have accepted formal occupancy of the premises known as _____ in the _____ Shopping Center, _____, _____, on the following date:

<u>EXHIBIT C-2</u>

<u>DESIGNATION OF AUTHORITY TO ACCEPT PREMISES</u>

_____

_____

_____

Attention: _____

    Re:    Lease Agreement dated _____ by and between _____ (as"
"Landlord""), and _____ (as ""Tenant""), for the Premises located at
_____ (the ""Lease"").

Dear _____:

    Please refer to the above referenced Lease.  The purpose of this letter is to unconditionally
authorize _____ as the Tenant''s designee for purpose of taking possession of the keys to the
premises described in the Lease for the purpose of accepting occupancy of said premises.  All actions taken by such
authorized designee shall constitute actions of the Tenant.

    Very truly yours,

    _____, Tenant

    By: _____
    Name: _____
    Title: _____

EXHIBIT D
SHOPPING CENTER SIGN SPECIFICATIONS

Shopping Center: Powder Basin Shopping Center,
Gillette, Wyoming
Tenant: Dickey's
Space: 2,653 Square Feet of Floor Area
North-west portion of building formerly
occupied by Ace Hardware

EXHIBIT "D"

SIGN CRITERIA

The purpose of this Sign Exhibit is to establish a harmonious aesthetically pleasing front elevation of the various shops as a whole while creating an environment which produces maximum traffic and promotes the greatest sales for all tenants. It is intended that signage be developed in an imaginative and varied, but coordinated and compatible, manner. Prior to opening for business, Tenant shall design, construct and install Tenant's signage at Tenant's sole cost and expense in accordance with the Sign Criteria set forth below:

A.   DESIGN- ALL STOREFRONT SIGNAGE

1.   Letters and Materials. Individually illuminated "pan-channel" "halo-effect" or "channel-lume" plex faced letters in script or block style.

   a.   Letter Returns - Painted an opposing color from the face of the sign.

   b.   Plex Face Color - Tenant's choice.

   c.   Neon Color - Tenant's choice.

   d.   Transformer Size - Minimum 60 MA for white neon. Minimum 30 MA for all colors other than white.

   e.   Letter Size for Single Line Signage - If individual letters are all upper case, the letter height shall not exceed twenty-eight inches (28"). If letters are a combination upper and lower case, upper case shall not exceed twenty-eight inches (28") and lower case shall not exceed twenty-two inches (22"). All signage shall be sized to conform to paragraph "g-Layout" below.

   f.   Letter Size for Double Line Signage - If sign letters are all upper case, letter height shall not exceed twenty-one inches (21"). If letters are a combination upper and lower case, capitals shall not exceed twenty-four inches (24") and lower case shall not exceed eighteen inches (18"). All signage shall be sized to conform to paragraph "g-Layout" below.

   g.   Layout - All wording and letters shall be centered and mounted on the sign fascia so that all letters are contained within six (6) inches from the top and bottom edge of the sign band area. The length shall be no closer than 3'-0" inside of each demising wall or side boundary of the Leased Premises. The signage or letter groupings shall be centered in the horizontal and vertical space provided, or in an alternate area close to the Tenant's storefront as may be deemed appropriate by the Landlord. At no time will a sign or portion thereof be allowed to extend over, beyond or past the top and bottom edge of the sign band, or area provided.

   h.   Wording - Wording shall be limited to the name of the store or Tenant's trade name as defined in the Lease. Wording of signs shall not include any product sold unless part of Tenant's regular trade name. Logos will be permitted with prior written approval from Landlord.

2.   Raceways. Raceways are typically not allowed. Raceways are only to be used when access to the area behind the sign band or canopy overhang is restricted and mounting of the transformers and conduits

behind the sign band is not possible. Tenant and/or Tenant's sign contractor shall perform an on-site survey to determine if a raceway is necessary.

    a.   <u>Maximum Dimensions</u> - 7" high, 7" deep, length to be held to absolute minimum.

    b.   <u>Material</u> - Pre-finished "paint-lock" type 18 gauge sheet metal.

    c.   <u>Color</u> - Raceway color shall match the storefront sign fascia color.

    d.   <u>Mounting Hardware</u> - Shall be concealed when possible and, if exposed, painted to match the raceway and sign band fascia.

B.   SIGN INSTALLATION / ERECTION

1.   Electrical power from the Tenant's panel shall be provided by Tenant and terminate to a junction box located in the ceiling area (typically in the area above the storefront door). Tenant shall extend conduit and wiring through the canopy overhang, and to the back of the sign fascia as required for tie-on to the Tenant's storefront sign. Tenant's sign shall not be powered by "Common Area" electricity.

2.   Disconnect switch, conduit, wiring and transformers installed by the Tenant must be totally concealed from view and installed in strict accordance with all local building and electric codes and be inspected by the City or Local Building Department. The disconnect switch should be located within the Leased Premises, not the canopy overhang.

3.   Time clock controls must be provided by the Tenant to control the hours of operation of the sign. The time clock must be mounted adjacent to the Tenant's electrical distribution panel located in the Leased Premises.

4.   Hardware used to install raceway and letters must be concealed and shall be of hot dipped galvanized iron, stainless steel, aluminum, brass or other non-rusting or corroding metal. If exposed, hardware shall be painted to match raceway and building fascia. No black iron material of any kind shall be permitted.

5.   All penetrations of the sign fascia shall be done behind the individual letters or if necessary the raceway, and sealed and finished in a water-tight manner.

6.   When installing signage on an existing sign band, the Tenant is responsible for patching, repairing and cleaning the sign band area to a like-new condition and removing all evidence of the prior signs existence.

7.   All signs, permits, and related electrical hookup and installation costs shall be Tenant's responsibility. Tenant shall repair any damage to the Leased Premises caused by the work of Tenant's sign contractor. All signs must conform to any applicable EPA requirements.

C.   GENERAL SPECIFICATIONS AND REQUIREMENTS

1.   All signs shall bear the Underwriters Laboratories (UL) label. All UL and sign manufacturer's labels must be placed on top of the sign and no portion of the labels shall be seen from below.

2.   Sign installer shall be a licensed sign contractor in accordance with the City and Local authority's regulations and shall also obtain all required permits prior to fabricating and installing such sign.

3.   Sign shall meet and conform to all requirements of local jurisdiction.

4.   Only <u>one</u> sign shall be permitted per storefront.

5.   Sign manufacturer's label shall not be affixed to the sign or raceway in such a manner that they are visible from the sidewalk or parking lot in the storefront vicinity.



6. The backside of all exposed neon shall be blacked out.

D. PLANS- LANDLORD'S APPROVAL

1. Tenant or Tenant's Sign Contractor on Tenant's behalf shall submit prior to the fabrication of the sign for Landlord's approval sign shop drawings depicting Tenant's proposed signage with such plans including at least the following information.

    a. <u>Dimensions of Sign Letters and Raceway</u> –

       i. All letter heights

       ii. All letter depths

       iii. Raceway dimensions

       iv. Overall length

    b. <u>Colors</u> –

       i. Color of neon tube when energized

       ii. Color of plexiglass face

       iii. Color of trimcap

       iv. Color of raceway (to match fascia)

       v. Color of letter return

    c. <u>Mounting Details - Hardware Finish - Instruction Notes.</u>

    d. Section through sign as mounted on sign fascia, true to scale and dimension.

    e. Size of neon tube.

    f. Size of transformer(s).

    g. Wiring instructions including time clock information.

2. Tenant shall not authorize sign fabrication without first obtaining Landlord's written approval and authorization to proceed. Tenant's sign shall be manufactured and installed according to Landlord's notes and comments on the stamped and signed copies of above mentioned sign manufacturer's shop drawings.

E. OTHER STOREFRONT SIGNAGE AND LETTERING.

1. Each Tenant shall be permitted to place upon each entrance of the Leased Premises up to 144 square inches of gold leaf or decal-applied lettering not to exceed two inches (2") in height, indicating Tenant's tradename (as on the sign fascia), hours of business and emergency telephone numbers. All signage applied directly on the storefront glass shall be individual reverse cut letters applied directly on the inside of Ute glass. If Tenant has a rear service door for receiving merchandise, Tenant shall have an engraved bakelite place with two inch (2") high block letters indicating Tenant's name and address installed. Tenant may install on its storefront, if any only if required by United States Post Office, the numbers for Tenant's street address in the exact location and in the size, type and color of the numbers as are stipulated by Landlord.

2. No storefront signage, lettering or graphics will be permitted other than that specifically described in Section E.1 above and or contained elsewhere in the Exhibit

F.  PROHIBITED (The following types of signs or sign components shall be prohibited):

1. Animated, flashing, or audible signs, or signs emitting smoke, odors or other material.

2. Signs employing exposed illuminated tubing or lamps must be approved in writing by Landlord.

3. Signs identifying leased department or concessionaires contained within the Leased Premises.

4. Signs perpendicular to the face of the storefront.

5. Window signage. (Other than that specifically outlined in Section E).

6. Exposed conduits.

G.  RESPONSIBILITY

All signs, permits, and related electrical hookup and installation costs shall be Tenant's responsibility. Tenant shall repair any damage to the Leased Premises caused by the work of Tenant's sign contractor. All signs must conform to any applicable EPA requirements.

H.  PERMITS

Tenant or Tenant's sign contractor shall obtain permits using the set of drawing previously received and approved by Landlord.

## EXHIBIT E

## RULES AND REGULATIONS

### POWDER BASIN SHOPPING CENTER, GILLETTE, WYOMING

The following Rules and Regulations are in effect at the Shopping Center, and Landlord reserves the right to amend, replace, supplement these Rules and Regulations, or promulgate new or additional Rules and Regulations, upon written notice to Tenant, who shall thereafter observe and be bound by same:

Tenant will deposit its trash only in the Shopping Center trash receptacles and shall participate in and comply with any procedures established for the collection, sorting, separation and recycling of waste products, garbage, refuse and trash.

Tenant shall use its best efforts to complete, or cause to be completed, all deliveries, loading, unloading and services to the Premises prior to 10:00 a.m. of each day. Tenant shall attempt to prevent any delivery trucks or other vehicles servicing the Premises from parking or standing in front of, or at the rear of, the Premises while the Shopping Center is open for business.

Tenant shall not display, paint or place, or cause to be displayed, painted or placed, any handbills, bumper stickers or other advertising devices on any vehicle parked in the parking area of the Shopping Center, whether belonging to Tenant, or to Tenant's agent, or to any other person, nor shall Tenant distribute, or cause to be distributed, in the Shopping Center, any handbills or other advertising devices.

Employees of Tenant shall not park their automobiles in those automobile parking areas of the Common Area which Landlord may from time to time designate for use by patrons of the Shopping Center.

Tenant and its employees shall park their cars only in those parking areas, if any, as are from time to time designated for that purpose by Landlord for employee parking and Landlord may change such designated areas at any time upon written notice to Tenant. Tenant shall furnish Landlord with the automobile license numbers of Tenant and Tenant's employees within fifteen (15) days after taking possession of the Premises and shall thereafter notify Landlord of any changes thereto within five (5) days after such change occurs. If Tenant or its employees fail to park their cars in the designated parking areas and after reasonable notice to Tenant, Landlord may charge Tenant Twenty-five and no/100 Dollars ($25.00) per car per day for the first such violation and Fifty and no/100 Dollars ($50.00) per car per day for each subsequent violation for each day or partial day that any car is parked in any area other than those designated; provided, however, Landlord agrees to give Tenant written notice of the first violation of this provision. Tenant shall have two (2) days thereafter within which to correct the violation; if said violation is not corrected within said two-day period, then the aforesaid fine shall be levied and Tenant shall pay the same within ten (10) days of Landlord's request therefor. After notice of such first violation, no prior notice of any subsequent violation shall be required. Landlord may immobilize and/or tow from the Shopping Center any vehicle parked in violation hereof, and/or attach violation stickers for notice to such vehicle. Tenant further agrees to hold Landlord harmless and defend Landlord against any and all claims of owner(s) of the vehicles which are towed or to which violation stickers have been stuck.

Tenant shall not display or sell merchandise, or place carts, portable signs, devices or any other objects in any part of the Shopping Center other than the Premises and Tenant shall not solicit or distribute materials in any manner in any part of the Shopping Center other than the Premises.

Tenant shall not place, affix or maintain any signs, advertising placards, names, insignia, trademarks, descriptive material or any other similar item or items outside, on or within twenty-four inches (24") of the Lease Line, the storefront, the glass panes and supports of the show windows, or any window, door, roof or perimeter demising walls of the Premises, except such signs as Landlord shall approve in writing in accordance with this Lease, nor shall any of said items be placed within the Premises in such a manner as to materially obstruct a view of Tenant's store from the Shopping Center or from any part of the outside, nor shall Tenant place any vents, structures, improvements, or obstructions of any type or kind on the exterior of the Premises. Landlord shall have the right, without prior notice to Tenant and without any liability, to remove any of the foregoing from the Premises, except for items as to which Tenant shall have first received express written approval of Landlord as to size, type, color, location, copy, nature and display qualities. Anything to the contrary in this Lease notwithstanding, Tenant shall not affix any sign to the roof of the Premises.

Tenant shall utilize no medium which can be heard or experienced outside of the Premises.

Tenant shall not cause or permit to be used any advertising materials or methods which are objectionable to Landlord, including without limitation, loudspeakers, mechanical or moving display devices, unusually bright or flashing lights and similar devices the effect of which may be seen or heard outside the

Premises.

Tenant shall not solicit business in the parking areas or other Common Areas, nor distribute any hand bills or other advertising matter in the parking or other Common Areas.

Tenant shall not use any sign or advertising material that is not of professional quality.

Tenant shall not erect an aerial or antenna on the roof or exterior walls of the Premises.

Tenant shall not install or affix to the exterior of the Premises any lighting or plumbing fixtures, shades, awnings, or exterior decorations (including exterior painting).

Tenant shall keep its display windows well lighted during all operating hours of Tenant, but in no event less than the hours established by Landlord as the operating hours of the Shopping Center plus one hour before opening and one hour after the closing of the Shopping Center.

Landlord reserves the exclusive right in its sole discretion to develop, modify and control for internal and external signage, advertising and display devices at the Shopping Center. Tenant shall immediately remove any signs or advertising or display devices erected or maintained in violation of this Lease or such criteria, and if Tenant fails to do so after notice from Landlord, Landlord may enter the Premises and cause such item to be removed, and the cost of such removal and restoring any damaged property shall be paid by Tenant upon demand.

Tenant shall operate its HVAC so as to provide a comfortable shopping environment to its customers. Without limiting the generality of the foregoing, at no time during the hours that Tenant is open for business with the public shall the average temperature within the retail areas of Tenant's store be permitted to fall below 68 degrees, or rise above 75 degrees Fahrenheit.